ACCEPTED
03-14-00718-CV
4925658
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/16/2015 7:57:20 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00718-CV

---

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS,
AT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/16/2015 7:57:20 PM
JEFFREY D. KYLE
Clerk

---

CITIZENS AGAINST THE LANDFILL IN HEMPSTEAD; MICHAEL
MCCALL; WAYNE KNOX; AND THE CITY OF HEMPSTEAD,
Plaintiffs/Appellants,
v.
TEXAS COMMISSION ON ENVIRONMENTAL QUALITY AND
PINTAIL LANDFILL, L.L.C., Defendants/Appellees.

From 201st District Court,
Travis County, Texas

---

**APPELLANTS CITIZENS AGAINST THE LANDFILL IN HEMPSTEAD,
MICHAEL MCCALL, WAYNE KNOX, AND CITY OF HEMPSTEAD'S
REPLY BRIEF**

---

**KELLY HART & HALLMAN LLP**
Monica M. Jacobs
State Bar No. 24007433
Diana L. Nichols
State Bar No. 00784682
301 Congress Avenue, Suite 2000
Austin, TX 78701
Telephone: (512) 495-6400
Facsimile: (512) 495-6401

**ATTORNEYS FOR THE
CITY OF HEMPSTEAD**

**HANCE SCARBOROUGH, LLP**
Terry L. Scarborough
State Bar No. 17716000
Michael L. Woodward
State Bar No. 21979300
V. Blayre Pena
State Bar No. 24050372
Wesley P. McGuffey
State Bar No. 24088023
400 W. 15th Street, Ste. 950
Austin, TX 78701
Telephone: (512) 479-8888
Facsimile: (512) 482-6891

**ATTORNEYS FOR APPELLANTS
CITIZENS AGAINST THE LANDFILL
IN HEMPSTEAD, MICHAEL
MCCALL, AND WAYNE KNOX**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………..…………2

INDEX OF APPENDICIES…………………………………………………...3

INDEX OF AUTHORITIES ……………………………………………….4

ARGUMENT ……………………………………………………………8

THE RULE INTERPRETATIONS ADVANCED BY APPELLEES IMPERMISSIBLY CONTRADICTS THE PLAIN LANGUAGE OF THE RULES THEY CLAIM TO INTERPRET......................................................8

A.    Straight From the Horse's Mouth:  A Concise Statement of Appellants' Argument…………………………………………………………..9

B.    A Requirement Must Require Something:  Appellees Impermissibly Interpret 30 Texas Administrative Code § 330.9(f) As Applying to Any Transfer Station/Waste Separation Facility Only If Its Requirements Are Met…………………………………………………………..11

C.    Appellees Impermissibly Interpret 30 Texas Administrative Code § 330.9(b)(3), Arguing Anything Besides the Clear, Unambiguous Language of the Rule..……………………………………………14

1.    TCEQ's Argument on Rule 330.9(b)(3) Misses the Point, Misconstrues the Argument, and Exudes Misunderstanding.…16

2.    It's Not a Sasquatch:  A Generally Applicable Permit Requirement Does Exist…………………………………………19

3.    Rules are Rules:  TCEQ Does Not Have the Authority to Violate or Otherwise Ignore Its Rules……………………………..22

4.    Don't Believe the Hype:  The Transfer Station/Materials Recovery Facility Does Not and Could Not Qualify for a Permit Exemption Under Rule 328, Because a Waste Stream Is Not Recyclable Material…………………………………………..24

5.      Not All Type V Facilities Are Equal. Transfer Facility ≠ Incinerator ≠ Material Recovery Facility……………………26

THE TCEQ DENIED AFFECTED PERSONS DUE PROCESS BY AUTHORIZING THE FACILITY THROUGH REGISTRATION RATHER THAN A PERMIT…………………………………………………..28

ALWAYS KEEP YOUR WORD: THE REGISTRATION SHOULD BE REVERSED BECAUSE TCEQ ALLOWED AN EXCESSIVE NUMBER OF NOTICES OF DEFICIENCY WELL BEYOND ITS PUBLICLY PRONOUNCED POLICY…………………………………………………...30

PRAYER …………………………………………………………………..35

CERTIFICATE OF COMPLIANCE …………………………………………...36

CERTIFICATE OF SERVICE …………………………………………………37

## INDEX OF APPENDICIES

Appendix A      Notices of Deficiencies

Appendix B      MSW Permit 2382
                MSW Permit 2379

# INDEX OF AUTHORITIES

**Statutes**

Texas Health and Safety Code

§ 361 ……………………………………………………………………………19

§ 361.061..……………………………………………………..………………..19

§ 361.086(a)..…………………………………………………...………………19

§ 361.0861……………………………………………..………………13, 20

§ 361.088…………………………………………………...…….…..29, 30

§ 361.0665…………………………………………………………...29, 30

§ 361.0666…………………………………………………………...29, 30

§ 361.067………………………………………………………….29, 30

§ 361.079……………………………………………………………29, 30

§ 361.0791……………………………………………………..…29, 30

§ 361.081…………………………………………………………29, 30

§361.092………………………………………………………..14, 20

§ 361.111(a)(4)………………………………………………..13

§ 361.111(a)(1)-(4)…………………………………………20

**Rules**

30 Texas Administrative Code

§ 55.201(b)(4)………………………………………………29

§ 55.203…………………………………………………………………29

§ 80.109(a)……………………………………………………………29

§ 80.109(b)(5)…………………………………………………………29

§ 312……………………………………………………………………23

§ 328……………………………………………………………………24

§ 328.2(3)………………………………………………………………26

§ 328.2(6)………………………………………………………………26

§ 328.4…………………………………………………………………25

§ 328.4(d) …………………………………………………………24, 26

§ 330……………………………………………………………………24

§ 330(88)………………………………………………………………19

§ 330.3…………………………………………………………………18

§ 330.3(a) ……………………………………………………………18

§ 330.3(117)…………………………………………………………17

§ 330.3(122) …………………………………………………………25

§ 330.3(157)…..……………………………………………8, 15, 18, 27

§ 330.3(174)…………………………………………………8, 12, 15, 18

§ 330.5(a)(3)…………………………………………………………27

§ 330.7…………………………………………………………………25

§ 330.7(a)…………………………………………………………8, 20, 21

§ 330.9…………………………………………………………11, 13, 18, 20, 21, 25

§ 330.9(b) ……………………………………………………………………21, 27

§ 330.9(b)(3) …………………………………………8, 9, 14, 15, 16, 17, 19

§ 330.9(c) ……………………………………………………………………13

§ 330.9(f) …………………………………………………8, 10, 11, 12, 13, 14

§ 330.9(f)(1) & (2) ……………………………………………………………10

§ 330.9(j) ……………………………………………………………………13

§ 330.9(b)–(p)………………………………………………………………..21

§ 330.11……………………………………………………………………….20

§ 330.13……………………………………………………………………….20

§ 330.25………………………………………………………………………20

§ 332…………………………………………………………………………24

## Cases

*CenterPoint Energy Houston Elect., LLC v. PUC*
   408 S.W. 3d 910 (Tex. App. – Austin 2013, pet denied)………......8, 13, 22

*County of Dallas v. Wiland,*
   216 S.W.3d 344, 347 (Tex. 2007)…………………………………..........29

*Alton McDaniel v. Texas Natural Resource Conservation Commission*
   982 S.W.2d 650; 1998 (Tex. App. – Austin 1998, pet. denied)…………23, 24

*PUC v. Gulf States Utilities Co.*
   809 S.W. 2d 201 (Tex. 1991) …………………………………………..8, 13, 22

*Rodriguez v. Service Lloyds Ins. Co.,*
   997 S.W.2d 248, 254 (Tex. 1999)……………………………………………18

*Tex. Comm'n on Envtl. Quality v. Kelsoe*
     286 S.W.3d 91 (Tex. App. – Austin 2009……………..………………….32

*Tex. Dept. of Transp.. V. Needham*
     S.W. 3d 314, 318 (Tex. 2002)……………………………………………18

*TGS-NOPEC Geophysical Co. v. Combs*
     340 S.W.3d 432, 439 (Tex. 2011) …………………………………….…..18

**Other Authority**

31 Tex. Reg. 2506……………………………………………………………11, 14, 21

31 Tex. Reg. 2548………...…………………………………………………….20, 21

TO THE HONORABLE COURT OF APPEALS:

Appellants Citizens Against the Landfill in Hempstead ("CALH") and City of Hempstead ("City") file this Reply Brief of Appellants, and in support, state as follows:

## ARGUMENT

**I.    THE RULE INTERPRETATIONS ADVANCED BY APPELLEES IMPERMISSIBLY CONTRADICT THE PLAIN LANGUAGE OF THE RULES THEY CLAIM TO INTERPRET.**

At the heart of this matter are four (or five) TCEQ rules.[1]   In their briefs, Appellees present their interpretations of two TCEQ registration rules at issue, 30 Texas Administrative Code § 330.9(b)(3) and 30 Texas Administrative Code § 330.9(f).  Appellees' interpretations are impermissible because they contravene the plain language of the rule.[2]  Further, Appellees' interpretations are impermissible because they are plainly erroneous and inconsistent with the regulation or its underlying statute.

Largely avoiding the clear, unambiguous language of the applicable rules, Appellees attempt to support their impermissible interpretations by arguing a

---

[1] 30 Tex. Admin. Code § 330.9(b)(3) (authorizing registration for certain transfer stations); 30 Tex. Admin. Code § 330.9(f) (authorizing registration for certain transfer stations/material recovery facilities); 30 Tex. Admin. Code § 330.3(157) (defining transfer station); 30 Tex. Admin. Code § 330.3(174) (defining waste-separation/recycling facility/material recovery facility); 30 Tex. Admin. Code § 330.7(a) (relating to and titled "permit required").

[2] When an agency fails to follow the clear, unambiguous language of its own regulation, the court must reverse the agency's action as arbitrary and capricious. *PUC v. Gulf States Utilities*, 809 S.W.2d 201, 207 (Tex. 1991); *CenterPoint Energy v. PUC*, 408 S.W.3d 910, 917.

number of points that are not at issue or serve only to confuse the issue. These arguments often miss the point, misconstrue Appellants' argument, and fail to acknowledge the applicability of regulatory definitions mandated by TCEQ rule. Appellees' arguments ultimately fail because there is a permit requirement in TCEQ rules and in the controlling statute, TCEQ cannot violate or ignore its rules, the permit and registration exception for source-separated recyclable materials does not apply to this facility, and a transfer station is not the equivalent to any other Type V processing facility. Not only do Appellees' arguments fail, their interpretation endangers the proper permitting of solid waste processing activities across our state.

A. **Straight From the Horse's Mouth: A Concise Statement of Appellants' Argument.**

Appellants' first argument is often misrepresented in Appellees' briefs. Rather than refuting each occurrence, Appellants' argument is concisely presented below for convenient comparison.

TCEQ failed to follow the clear, unambiguous language of at least four of its regulations when it issued Registration No. 40259 for Pintail's transfer station/material recovery facility ("Pintail's Facility" or "Facility"). First, TCEQ failed to follow Rule 330.9(b)(3), the provision under which Applicant claimed authority for registration. This rule expressly applies only to transfer station facilities, and this rule was violated when TCEQ allowed it to be used as registration authority for a materials recovery operation. Second, TCEQ failed to follow Rule

330.9(f), which allows registration for any transfer station facility with materials recovery operations that meets the 10/50 requirements.[3] It is undisputed that the Facility is a transfer station with materials recovery operations, and that the 10/50 requirements were not met. This is the only registration authorization available for materials recovery activities at a transfer station without an already permitted landfill attached. Thus, TCEQ's refusal to apply this rule's requirements is impermissible.

Third, TCEQ failed to follow the clear, unambiguous language of its own definitions. TCEQ rules specifically define both types of facilities at issue, transfer stations and waste separation/recycling facilities (also referred to as a materials recovery facilities), and these facilities engage in different waste management activities. TCEQ is required to follow its definitions, which are codified as TCEQ rules. Because TCEQ failed to follow the plain language of its rules, the registration of this Facility must be reversed.

It should be noted that Appellants are not challenging the authority of TCEQ to issue registrations. Appellants fully acknowledge TCEQ's authority to register certain transfer stations, to register certain transfer stations with materials recovery operations, to register certain recycling facilities, and to register any other type of waste management activity that is allowed by law. In fact, permissible TCEQ

---

[3] The so-called 10/50 requirements are found at 30 Texas Administrative Code § 330.9(f)(1)&(2). They require a minimum 10% recovery rate and disposal at an existing permitted facility within 50 miles in order to qualify for registration.

10

registrations form the heart of this case. The key is, when exercising its authority, TCEQ must follow its rules. In this case it did not, so reversal is required.

**B.    A Requirement Must Require Something:    Appellees Impermissibly Interpret 30 Texas Administrative Code § 330.9(f) As Applying to Any Transfer Station/Waste Separation Facility Only If Its Requirements Are Met.**

The first relevant rule at issue is 330.9(f). Rule 330.9(f) is intended to allow a qualifying transfer station/material recovery facility to obtain a registration rather than a permit.[4] The rule reads, "(f) A registration is required for any new MSW Type V transfer station that includes a material recovery operation that meets all of the following requirements. (1) Materials recovery. [10% recovery rule]. (2) Distance to landfill. [50 mile disposal rule]."

Upon adoption of 30 Texas Administrative Code § 330.9 to allow registration instead of permitting, TCEQ recognized and pronounced that the rule lists all of the permitting exceptions that are eligible for registration. 31 Tex. Reg. 2506 ("The commission adopts new §330.9, Registration Required, to list all MSW management activities that are exempt from permitting requirements but that still require commission approval by registration.")

Appellees do not rely on 330.9(f) as registration authority, and Appellees' interpretation of 330.9(f) correctly bars its use for registration of this facility.

---

[4] *See* 31 Tex. Reg. 2506.

However, their interpretation continues to ignore the language of the rule, specifically, the word "any" and the defined term, "material recovery operation." Appellees argue that the 10/50 rule requirements of 330.9(f) do not apply to this transfer station/materials recovery facility, even though the rule expressly applies to "*any* new MSW Type V transfer station that includes a *material recovery* operation…." Appellees argue that the requirements of Rule 330.9(f) (the 10/50 rule) only apply to a transfer station/materials recovery facility that already meets the 10/50 rule.[5] In other words, Appellees argue that if the rule's requirements are not met, the rule does not apply.

In its best light, Appellees' interpretation means that if rule 330.9(f)'s requirements are not met, then the rule does not allow registration of a transfer station/materials recovery facility. Appellees argue, however, that if the rule's 10/50 requirements are not met, the facility may simply be registered as a transfer station, despite the fact that it is actually a transfer station and material recovery facility. Appellees' interpretation ignores the word "any" and the term "material recovery," which is defined in rule 330.3(174).[6] Because Appellees' interpretation contravenes

---

[5] Pintail's Brief at 21-22; TCEQ's Brief at 16.

[6] 30 Tex. Admin. Code 330.3(174) ("Waste-separation/recycling facility--A facility, sometimes referred to as a material recovery facility, in which recyclable materials are removed from the waste stream for transport off-site for reuse, recycling, or other beneficial use.")

the clear, unambiguous language of the rule itself, it is impermissible.[7]  However, even if their interpretation did not contravene the rule's language, the registration would fail because there is no other applicable registration authority available.

Appellants do concede that registration for waste separation/material recovery/recycling activities could be properly granted through a different registration provision, but those provisions must expressly apply to those activities, and cannot apply without a preexisting permitted landfill under current rules.  In order to qualify waste separation/recycling/materials recovery activities for registration, one of the specific provisions allowing these specific activities to be registered must be met.

These statutorily prescribed registration provisions available for recycling activities are listed in Rule 330.9, and include 330.9(c) (for registration of a waste separation/recycling facility within the boundaries of an existing, existing permitted MSW landfill, with statutory authority originating in Texas Health and Safety Code 361.0861), 330.9(f) (for a transfer station that includes a material recovery operation and meets the 10/50 requirements, with statutory authority originating in Texas Health and Safety Code 361.111(a)(4)), and 330.9(j) (for certain material recovery operations from an existing landfill, with statutory authority originating in Texas

---

[7] When an agency fails to follow the clear, unambiguous language of its own regulation, the court must reverse the agency's action as arbitrary and capricious. *Gulf States Utilities*, 809 S.W.2d at 207 (Tex. 1991); *CenterPoint*, 408 S.W.3d at 917.

Health and Safety Code 361.092).  TCEQ Rule 330.9(f) is the only provision allowing materials recovery that could have been utilized, because there is not an existing landfill.  Because the requirements of 330.9(f) were not met, a registration is not available and this facility requires a permit.

**C. Appellees Impermissibly Interpret 30 Texas Administrative Code § 330.9(b)(3), Arguing Anything to Distract from the Clear, Unambiguous Language of the Rule.**

The second relevant registration rule at issue is 330.9(b)(3).  Appellees purport to rely on this rule for registration authority.  Rule 330.9(b)(3) is intended to allow qualifying transfer stations to obtain a registration rather than a permit.  *See* 31 Tex. Reg. 2506 ("The commission adopts new §330.9, Registration Required, to list all MSW management activities that are exempt from permitting requirements but that still require commission approval by registration.")  The rule reads,

> (b) A registration is required for an **MSW transfer station facility** that is used in the transfer of MSW to a solid waste processing or disposal facility from any of the following: … (3) a facility used in the transfer of MSW that transfers or will transfer 125 tons per day or less;

30 Tex. Admin. Code § 330.9(b)(3).

Appellees argue that a transfer station that includes a materials recovery operation may be registered under Rule 330.9(b)(3), even though the rule expressly applies only to MSW transfer station facilities.  Appellees interpretation impermissibly expands the scope of Rule 330.9(b)(3) in contravention of the rule's clear, unambiguous language, because Rule 330.9(b)(3) expressly applies only to

MSW transfer station facilities. Transfer station facilities are defined by rule, and are separately defined from materials recovery facilities. There is a clear distinction between these types of waste processing activities. *See* 30 Tex. Admin. Code § 330.3(157) (defining transfer station); 30 Tex. Admin. Code § 330.3(174) (defining materials recovery facility/waste separation facility/recycling facility).[8]

All of the Appellees interpretations contravene the plain language, "transfer station facility," which is a term defined by rule. Additionally, the mere fact that a facility "is used in the transfer" of waste does not eliminate the rule's express application to "transfer station" facilities only, and it does not change the regulatory definition of "transfer station." Given the rule's express application to "transfer station" facilities, the words "is used in the transfer" serve the purpose of describing the activities of a transfer station consistently with its regulatory definition. There is no indication that the words "is used in the transfer" expand the applicability of rule 330.9(b)(3), and such a reading contravenes the clear, unambiguous language of TCEQ rules 330.9(b)(3), 330.3(157), and 330.3(174).

---

[8] 30 Tex. Admin. Code § 330.3(157) ("Transfer station--A facility used for transferring solid waste from collection vehicles to long-haul vehicles (one transportation unit to another transportation unit). It is not a storage facility such as one where individual residents can dispose of their wastes in bulk storage containers that are serviced by collection vehicles."); 30 Tex. Admin. Code § 330.3(174) (Waste-separation/recycling facility--A facility, sometimes referred to as a material recovery facility, in which recyclable materials are removed from the waste stream for transport off-site for reuse, recycling, or other beneficial use.)

Appellees offer a number of justifications for violating the plain language of TCEQ rules, but they miss the mark. The arguments largely dodge the language of the rules at issue, and upon inspection, they do not justify Appellees' proposed interpretations. Their arguments fail because: 1) TCEQ's argument fails to distinguish between transfer activities and materials recovery/waste separation activities, fails to acknowledge the applicability of TCEQ rules' definitions, and even inadvertently admits that the claimed registration authority does not apply by stating that no MSW will be transferred at the facility; 2) a permit is generally required for waste management activities unless an exception applies; 3) TCEQ cannot violate or ignore its rules; 4) the permit and registration exception for source-separated recyclable materials does not and could apply to this facility because it accepts a waste stream; and 5) a transfer station is not equivalent to any Type V processing facility, and Appellees' interpretation endangers the proper permitting of all other Type V solid waste processing facilities.

### 1. TCEQ's Argument on Rule 330.9(b)(3) Misses the Point, Misconstrues the Argument, and Exudes Misunderstanding.

TCEQ's argument regarding rule 330.9(b)(3) completely misses the mark. TCEQ's argument is fundamentally flawed because it misconstrues Appellants' argument as complaining that no <u>processing</u> or storage may occur at a transfer

station.[9]  Appellants do not challenge registration of all processing activities, but only challenge registration of *materials recovery/waste separation/recycling activities* at a transfer station *using Rule 330.9(b)(3)* as justification.  In reality, transfer activities and materials recovery/waste separation/recycling activities are each a subset, or different type of waste processing activity, which is a much more broadly defined term.[10]  Even incineration of waste is a processing activity.[11]

TCEQ argued that processing activities are incidental and necessary to operate a transfer station.[12]  This argument has very little relevance because processing is such a broad term.  Because the scope of the term "processing" includes both transfer activities and material recovery activities, it follows that processing would be a necessary activity to transfer waste (because transfer is a form of processing).  The more relevant observation is that materials recovery/waste separation/recycling activities (another distinct form of processing) are most certainly not necessary to

---

[9] TCEQ Brief at 13.

[10] 30 Tex. Admin. Code § 330.3(117) ("Processing--Activities including, but not limited to, the extraction of materials, transfer, volume reduction, conversion to energy, or other separation and preparation of solid waste for reuse or disposal, including the treatment or neutralization of waste, designed to change the physical, chemical, or biological character or composition of any waste to neutralize such waste, or to recover energy or material from the waste, or render the waste safer to transport, store, dispose of, or make it amenable for recovery, amenable for storage, or reduced in volume.").

[11] *Id.*

[12] TCEQ Brief at 15.

the transfer of waste from one transportation unit to another transportation unit, nor are those activities incidental to transfer activities.[13]

Further, TCEQ appears to misrepresent the applicability of its own definitions. On page 13 of is brief, TCEQ appears to imply that definitions of MSW management activities in Rule 330.3 (such as transfer station and waste separation/materials recovery/recycling facility) do not apply to registration Rule 330.9 because they appear in a different subchapter.[14] This is flat wrong. Not only are the definitions and registration rules in the same subchapter (Subchapter A), the definitions would apply even if they were not. The definitions of Rule 330.3 apply to the entire Chapter 330 regarding municipal solid waste. *See* 30 Tex. Admin. Code § 330.3(a) (stating "[t]his section contains definitions for terms that appear throughout this chapter."). The TCEQ and reviewing courts are bound to construe these terms by their regulatory definitions only.[15]

---

[13] *See* 30 Tex. Admin. Code § 330.3(157); *see also* 30 Tex. Admin. Code § 330.3(174).

[14] TCEQ Brief at 13 (stating "Appellants support their argument by citing to various definitions of MSW management in other subchapters of the MSW rules. Appellants' interpretation of the Commission's rules is unreasonable…").

[15] *Tex. Dept. of Transp. V. Needham*, 82 S.W.3d 314, 318 (Tex. 2002) ("But if a statute defines a term, a court is bound to construe that term by its statutory definition *only*.") (emphasis added); *see also TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("If a statute … assigns a particular meaning to a term, we are bound by the statutory usage."); *id*. at 438 ("We interpret administrative rules, like statutes, under traditional principles of statutory construction."); *Rodriguez v. Service Lloyds Ins.*, 997 S.W.2d 248, 254 ("We construe administrative rules, which have the same force as statutes, in the same manner as statutes.").

Finally, in another section of TCEQ's brief, TCEQ inadvertently admits by implication that the registration authority of Rule 330.9(b)(3) does not apply at all, because Pintail's facility "will not accept municipal solid waste" and will only accept construction and demolition waste.[16]  Because Rule 330.9(b)(3) applies only to a "**MSW** transfer station facility that is used in the transfer of **MSW**," TCEQ has inadvertently refuted its own argument that the registration authority of Rule 330.9(b)(3) applies to Pintail's facility.  TCEQ's statement, however, is inaccurate.  MSW is broadly defined, and does include construction and demolition waste.[17]

### 2.  It's Not a Sasquatch:  A Generally Applicable Permit Requirement Does Exist.

TCEQ's brief also implies that there is no general permitting requirement in the statute or in its rules, and this too is false.  TCEQ has authority to regulate solid waste activities, but its authority is not unfettered.  It is restricted by the terms of the controlling Texas Health and Safety Code Chapter 361, and by TCEQ rules.  Texas Health & Safety Code § 361.061 grants TCEQ the power to require and issue permits, while Texas Health & Safety Code § 361.086(a) expressly requires a separate permit at each solid waste facility.  The statute states, "[e]xcept as provided in Subsection (d) [which does not apply here], a separate permit is required for each

---

[16] TCEQ Brief at 10.

[17] 30 Tex. Admin. Code § 330.3(88) ("Municipal solid waste--Solid waste resulting from or incidental to municipal, community, commercial, institutional, and recreational activities, including garbage, rubbish, ashes, street cleanings, dead animals, abandoned automobiles, and all other solid waste other than industrial solid waste.")

solid waste facility." Read together, these sections require TCEQ permits at solid waste facilities, unless an exception applies. Exceptions to the permit requirement that allow or mandate registration are codified in the Health & Safety Code and have been duplicated in the TCEQ rules.[18] A permit is required if no exception applies.

TCEQ's brief denies the existence of a general permitting requirement. This is surprising, because this permit requirement has been repeatedly recognized and documented by TCEQ in almost every imaginable way. It has been codified in TCEQ rules, recited in Texas Register notices, and pronounced in TCEQ guidance documents. TCEQ rule 330.7(a) codifies the general permit requirement and requires a permit unless an exception to the permitting requirement is applicable to the activities of the facility.[19] These permitting exceptions allow solid waste management activities to be authorized by registration, notification, or to be completely exempt from permitting, registration, or notification.[20]

TCEQ acknowledged the permitting requirement applicable to processing facilities, including transfer stations, when it refused to remove the word "transfer" from the definition of "processing." *See* 31 Tex. Reg. 2548 (reinserting "transfer" back into the definition of "processing" to keep the permitting requirement for

---

[18] *See, e.g.,* Tex. Health & Safety Code 361.0861; Tex. Health & Safety Code 361.111(a)(1)–(4); Tex. Health & Safety Code 361.092.
[19] 30 Tex. Admin. Code § 330.7(a) (relating to title, "Permit Required").
[20] 30 Tex. Admin. Code §§ 330.9, 330.11, 330.13, and 330.25.

transfer facilities).[21]  TCEQ also recognizes the permitting requirement applicable to transfer stations in its relevant regulatory guidance document, which plainly states that a permit is required if a transfer station does not qualify for registration.[22]

There are limited exceptions to the permitting requirement that allow MSW management activities to be authorized by registration, and these exceptions are specifically enumerated in TCEQ's registration rule 330.9.[23]  Upon adoption of Rule 330.9 to allow registration instead of permitting, TCEQ pronounced that the rule lists all of the permitting exemptions that are eligible for registration:  "The commission adopts new §330.9, Registration Required, to list **all** MSW management activities that are exempt from **permitting requirements** but that still require commission approval by registration." (emphasis added).[24]  The generally applicable permit requirement appears in the Health & Safety Code, the TCEQ rules, the Texas

---

[21] The comment and response states in full: "Comment:  HCPES [Harris County Attorney's Office and Harris County Public Health and Environmental Services, Pollution Control Division] commented that the proposed deletion of the term "transfer" from the definition of processing would change the meaning of §330.7(a) relating to Permit Required. **By this proposed definition change, transfer stations would no longer be required to obtain permits to operate.  HCPES stated that by their nature, transfer stations require agency and public review of the permitting process unless exempted** due to a location on an existing landfill or if they meet registration requirements under §330.9(b).  Response:  **The commission agrees with this comment and has reinserted the term "transfer" back into the definition of processing** in response to these comments and also to be consistent with THSC, §361.003, Definitions." 31 Tex. Reg. 2548 (emphasis added).

[22] *See* Initial Brief of Appellants, Appendix B (TCEQ Publication No. RG-469, Traditional Municipal Solid Waste Disposal:  A Guide for Local Governments (listing transfer station registration exceptions in 330.9(b) and stating, "If none of these criteria can be met, a permit is required")).

[23] 30 Tex. Admin. Code § 330.9(b)–(p).

[24] 31 Tex. Reg. 2506 (emphasis added).

Register, and TCEQ guidance documents.  Given its frequent appearance in relevant authority, TCEQ's argument against a permit requirement must fail.

### 3. Rules Are Rules:  TCEQ Does Not Have the Authority to Violate or Otherwise Ignore Its Rules.

Appellees argue that TCEQ has broad regulatory authority, implying that this authority gives the agency license to expand the applicability of Rule 330.9(b)(3) beyond the regulatory definition of transfer station to include materials recovery operations.  Appellees also argue that TCEQ has authority to ignore Rule 330.9(f), which expressly applies to any transfer station with a materials recovery operation.  Furthermore, Appellees necessarily argue that TCEQ is not bound by its regulatory definitions.

Appellees' arguments fail because TCEQ must follow its rules, including applicable definitions.  The rules cannot be ignored; they cannot be selectively applied.  When an agency fails to follow the clear, unambiguous language of its own regulation, the court must reverse the agency's action as arbitrary and capricious.[25] A rule's plain language must be followed unless it is ambiguous.[26]  If a rule is ambiguous or leaves room for policy determinations, a court may not defer to an

---

[25] *Gulf States Utilities*, 809 S.W.2d at 207 (Tex. 1991); *CenterPoint*, 408 S.W.3d at 917.
[26] *CenterPoint*, 408 S.W.3d at 916.

agency's interpretation that is plainly erroneous or inconsistent with the regulation or its underlying statutes.[27]

Appellees cite *McDaniel v. TNRCC* as support for the proposition that TCEQ has the authority to issue registrations, but again, that issue is not in dispute here. 982 S.W.2d 650 (Tex. App.—Austin 1998, pet. denied). Appellants fully acknowledge TCEQ's authority to issue registrations. The point is that the <u>TCEQ must follow its rules</u> when issuing a registration. *McDaniel* is an example of the agency following its rules that were promulgated for registration: "[t]he <u>TNRCC acted in compliance with its own properly promulgated rules</u> and issued the requested registration."[28] However, the case is largely irrelevant because it involves different registration rules (that were actually followed), different application procedures, and different environmental concerns. *McDaniel* is a case about <u>beneficial application of sewage sludge</u> that <u>properly qualified for registration</u> under the applicable <u>"Sludge Use, Disposal, and Transportation" rules</u>, which are in an entirely different chapter of TCEQ's rules. 982 S.W.2d 650 (Tex. App.—Austin 2009, pet. denied); *see also* 30 Tex. Admin. Code § 312.

Worth noting, Appellee Pintail's brief fails to mention the crucial fact that the <u>TNRCC's registration rules were followed in *McDaniel*</u>. This omission is

---

[27] *Id.*

[28] *McDaniel v. TNRCC*, 982 S.W.2d 650, 653 (Tex. App.—Austin 2009, pet. denied).

misleading, because the instant case is squarely about whether TCEQ followed its applicable registration rules. Upon inspection, *McDaniel* supports the Appellant's position. Like other applicable case law, it acknowledges and applies the requirement that rules must be followed: "[w]hen an agency fails to follow its own rules, reversal and remand is required if a showing of harm or prejudice is made."[29] Unlike in *McDaniel*, in this case TCEQ did not follow its rules.

### 4. Don't Believe the Hype: The Transfer Station/Materials Recovery Facility Does Not And Could Not Qualify for a Permit Exemption Under Rule 328, Because a Waste Stream Is Not Recyclable Material.

This Facility is not exempt from permitting and registration requirements under 30 Texas Administrative Code Chapter 328, because the Facility will accept a stream of waste (which is not classified as recyclable material) and will *separate* recyclable materials from that waste stream. Under the relevant rule, "[a] facility that processes <u>recyclable material</u> that contains <u>more than incidental amounts</u> of non-recyclable waste must obtain a permit or registration as applicable under Chapter 330 or Chapter 332 of this title unless the executive director approves its request for alternative compliance."[30] The permitting and registration exception for facilities

---

[29] *Id.* at 654.
[30] 30 Tex. Admin. Code § 328.4(d).

processing recyclable material is completely inapplicable to this case and serves only to cause confusion.

A waste stream is not "recyclable material." The permit and registration exception under TCEQ rule 328.4 do not apply to this facility or this registration because by its plain language, it addresses "recyclable material." By definition, "recyclable material" only ceases to be solid waste after it "**has been** recovered or diverted from the nonhazardous waste stream" and is useful in the manufacture of products.[31] Because this Facility will accept a waste stream prior to separation of recyclable materials out of that waste stream, it cannot qualify for the "recyclable materials" permit exemption for its materials recovery/waste separation/recycling facility. Guidance on TCEQ's webpage confirms this interpretation of the rules by stating, "[f]acilities that *separate* recyclable materials from a municipal solid waste stream must be permitted or registered as a municipal solid waste processing facility in accordance with 30 TAC Chapter 330, Section (§) 330.7 or 330.9" (emphasis in original).[32] As previously discussed, the Pintail facility does not qualify for authorization by registration, so it must be permitted.

---

[31] 30 Tex. Admin. Code § 330.3(122) ("Recyclable material--A material that has been recovered or diverted from the nonhazardous waste stream for purposes of reuse, recycling, or reclamation, a substantial portion of which is consistently used in the manufacture of products that may otherwise be produced using raw or virgin materials. Recyclable material is not solid waste. However, recyclable material may become solid waste at such time, if any, as it is abandoned or disposed of rather than recycled, whereupon it will be solid waste with respect only to the party actually abandoning or disposing of the material.")

[32] C.R. at 505 (CALH and City's Joint Motion for New Trial, page 13, Ex. 3).

Additionally, "incidental amounts," as referenced in rule 328.4(d), is defined in the rules. This definition also confirms that the exception applies only to source-separated recyclable materials, or material that <u>at the point of generation,</u> was separated, collected, and transported separately from MSW waste.[33] Finally, Pintail admits that the recyclable materials permitting and registration exception does not apply to the Facility, and that it was not claimed as authority. Pintail's brief admits that Pintail anticipated processing "<u>more than</u> an incidental amount of <u>waste</u>," and therefore, the permitting and registration exception for recyclable materials could not apply.[34] However, Pintail completely fails to inform the Court that it could not have ever qualified for the permit and registration exemption because *it will be handling waste.* Pintail's Facility will accept a waste stream, not source-separated recyclable materials used to make products. Because Pintail's Facility is a materials recovery facility that accepts a waste stream, it never could have qualified and this provision is completely inapplicable and irrelevant to this case.

**5. Not All Type V Facilities Are Equal. Transfer Facility ≠ Incinerator ≠ Material Recovery Facility.**

---

[33] *See* 30 Tex. Admin. Code § 328.2(3) (defining incidental amounts of non-recyclable waste as no more than 10% of any incoming load and requiring reasonable efforts to maintain <u>source-separation</u> of recyclable material from waste); *see also* 30 Tex. Admin. Code § 328.2(6) (defining source-separated recyclable material as being recyclable material that has been <u>at the point of generation,</u> separated, collected, and transported separately from MSW waste).

[34] Pintail's Brief at 20.

Appellee Pintail's argument relies on an audacious assertion that the permitting exception used to register the Type V transfer station activities (30 Tex. Admin. Code §330.9(b)) can be expansively utilized as registration authority for materials recovery waste processing activities at the facility, and even more broadly, for any additional activities included within the definition of a Type V facility. Appellee implies that all Type V facilities are subject to the same regulatory permitting requirements, but they are not. Type V facilities include all kinds of solid waste processing. In addition to waste transfer activities, Type V facilities incinerate, shred, grind, bale, salvage, separate, dewater, reclaim, store, and process solid waste in other ways. Conversely, a transfer station is separately defined in TCEQ rules, and its definition only includes waste transfer activities.[35] A transfer station is a very narrow subset of all Type V facilities that merely performs a waste transportation function.[36] In short, a Type V transfer station and a Type V facility are not the same thing. A transfer station is just one kind of Type V facility.

---

[35] 30 Tex. Admin. Code §330.3(157).

[36] 30 Tex. Admin. Code §330.5(a)(3) ("MSW facility - Type V. Separate solid waste processing facilities are classified as Type V. These facilities include processing plants that transfer, incinerate, shred, grind, bale, salvage, separate, dewater, reclaim, and/or provide other storage or processing of solid waste. Owners or operators shall follow the minimum design and operational requirements prescribed in Subchapter E of this chapter (relating to Operational Standards for Municipal Solid Waste Storage and Processing Units); Subchapter F of this chapter; Subchapter G of this chapter; Subchapter H of this chapter, if required; Subchapter K of this chapter; Subchapter L of this chapter, if financial assurance is required; Subchapter M of this chapter; and Chapter 37, Subchapter R of this title, except that owners and operators of recycling facilities who store combustible material are required to comply with Chapter 37, Subchapter J of this title (relating to Financial Assurance for Recycling Facilities). Groundwater monitoring may be

TCEQ regularly issues permits, rather than registrations, to Type V processing facilities that store, process, compost, and recycle waste.[37] Under Appellees' erroneous reading, any company with knowledge of Pintail's permitting loophole could seek to avoid the permitting requirement in the same way that Pintail has. As long as an applicant transferred less than 125 tons of MSW per day, there would be no need to seek a permit for any other processing activities. The required permitting process for Type V facilities that incinerate, shred, grind, bale, salvage, separate, dewater, reclaim, and/or provide other storage or processing of solid waste could be completely avoided and the affected public would not even have an opportunity for hearing. This interpretation cannot be correct because it would undermine or even eliminate the permitting requirement for Type V solid waste processing facilities.

## II. THE TCEQ DENIED AFFECTED PERSONS DUE PROCESS BY AUTHORIZING THE FACILITY THROUGH REGISTRATION RATHER THAN A PERMIT.

Appellees' argument that due process was not violated hinges on the erroneous assertion registration was appropriate and therefore, no statutory or rule-

---

required by the executive director and shall be maintained in accordance with the requirements of Subchapter J of this chapter.").

[37] C.R. at 389 (CALH Reply Brief at 17) (citing MSW Permit No. 2382, issued May 1, 2014 (authorizing storage, processing, composting, and recycling recovered materials by permit); *see also* MSW Permit No. 2379, issued November 9, 2012 (authorizing storage, processing, and recycling recovered materials by permit). At the time CALH filed its Reply Brief in the District Court proceeding, both of these permits were available on TCEQ's webpage titled "Municipal Solid Waste Applications Posted on the Internet." Because they are no longer posted on the TCEQ's webpage at this time, a copy of each permit is provided in **Appendix B**.

based right to a contested case hearing was denied. However, because a permit is required, affected persons do have a statutory right to a contested case hearing.[38] Additionally, affected persons have a right to a contested case hearing under TCEQ rules.[39] Where there is a statutory right to a hearing and a right to a hearing under applicable rules, denial of the hearing is a violation of procedural due process.[40]

CALH and the City are both parties in the ongoing contested case hearing for the Pintail Landfill at the same location as this Facility. CALH members and City of Hempstead have property interests that would be affected by the proposed facility. For example, CALH has members that reside adjacent to the proposed location and rely on water wells as their sole source of domestic water, and the City supplies water to its residents from wells located near the Facility. The Facility is also located within the City's extraterritorial jurisdiction. In a contested case proceeding, the presiding judge has the authority to make the determination of affected status to identify parties.[41] Typically, the facts above would be sufficient to demonstrate

---

[38] *See* Tex. Health & Safety Code §§ 361.088, 361.0665, 361.0666, 361.067, 361.079, 361.0791, and 361.081 (relating to various application notice requirements, published notice requirements, mailed notice requirements, hearing notice requirements, and contested case hearing requirements for MSW permit applications).

[39] 30 Tex. Admin. Code § 55.201(b)(4); 30 Tex. Admin. Code § 55.203.

[40] *County of Dallas v. Wiland*, 216 S.W.3d 344, 347 (Tex. 2007) (holding that "the deputies were discharged without the hearing before the civil service commission promised by system rules to determine whether just cause existed, and thus they were denied procedural due process.") (emphasis added).

[41] *See* 30 Tex. Admin. Code § 80.109(a) ("Determination by judge. All parties to a proceeding shall be determined at the preliminary hearing or when the judge otherwise designates."); 30 Tex. Admin. Code § 80.109(b)(5) ("Affected persons shall be parties to hearings on permit applications,

29

affected status. These examples are presented for illustration of Appellants' interests.

CALH and the City's interests should have been afforded the protection of the permitting process. The permitting process, unlike the registration process, triggers statutorily granted due process rights to notice and a contested case hearing by virtue of the Texas Health and Safety Code.[42] Here, the issuance of a registration when a permit was required denied members of CALH, the City, and all other affected persons their right to notice and a contested case hearing, as required under the Health and Safety Code for MSW permit applications.[43]

## III. ALWAYS KEEP YOUR WORD: THE REGISTRATION SHOULD BE REVERSED BECAUSE TCEQ ALLOWED AN EXCESSIVE NUMBER OF NOTICES OF DEFICIENCY WELL BEYOND ITS PUBLICLY PRONOUNCED POLICY.

The Notice of Deficiency ("NOD") policy that was reported in the TCEQ Sunset Evaluation Report to the Texas Legislature, instructed to TCEQ staff in internal TCEQ procedural documents for registration, and stated in external correspondence to applicants should be binding on the agency. Appellees argue that TCEQ's public statements to the legislature, the public, applicants, and their own

---

based upon the standards set forth in §55.29 and §55.203 of this title (relating to Determination of Affected Person.").

[42] *See* Tex. Health & Safety Code §§ 361.088, 361.0665, 361.0666, 361.067, 361.079, 361.0791, and 361.081 (relating to various application notice requirements, published notice requirements, mailed notice requirements, hearing notice requirements, and contested case hearing requirements for MSW permit applications).

[43] *See id.*

staff reviewers cannot bind the agency, because the statements were not officially promulgated under the APA as rules. However, the interest of justice requires the TCEQ to be bound by its universally professed NOD policy pronouncements that were made in promises to the legislature, declarations to applicants, instructions to its staff, and assurances to the public. Appellees argue that the NOD policy should not be binding on the agency because enforcement of the well-publicized policy would have undesirable results, but the converse is true. The only fair remedy in this situation is to enforce the NOD policy that TCEQ professed to follow. Any other course of action would cause harm to the public, to the agency, to the regulated community, to the TCEQ staff, to the Texas legislature, and to taxpayers.

The public deserves to have confidence that the TCEQ applies its stated policies, including the two NOD policy, to all applicants in a uniform manner. Allowing TCEQ to disregard its own NOD policy would undermine public confidence in the agency, and ultimately harm the agency's reputation. The regulated community deserves to have a uniform process in which applicants are all treated equally. Allowing the TCEQ to selectively disregard its stated NOD policy harms the regulated community and threatens the environment by allowing facilities to be operated by companies that lack the competence to complete an application as required without excessive NODs. Agency management also suffers reputation damage in such a scenario, because they are forced to say one thing and do another.

Additionally, allowing the NOD policy to be disregarded is unfair to agency staff members, who will be unable to rely on the plain letter of the policy instructions they are issued. Finally, disregarding the NOD policy is unfair to the Texas legislature and the taxpayers whose dollars support the agency's activities. TCEQ should be held to its two NOD policy, which was intended to promote efficiency within the agency. Allowing the NOD policy to be disregarded undermines the purpose of the policy altogether – to ensure efficient review of applications. Efficient application review saves taxpayer dollars and expedites review for applicants. TCEQ cannot be allowed to disregard its NOD policy. Such a decision would be unfair to all participants, and would merely enable the TCEQ to waste taxpayer and applicant resources with unnecessarily lengthy application reviews.

Worthy of note, returning a deficient application is not unprecedented. Counsel is aware of two examples referenced in briefing at the administrative level for this registration application alone.[44] Indeed, this Court dismissed an untimely appeal of one of these returned applications.[45]

Appellees argue that it was reasonable to continue to send Pintail NODs in violation of the TCEQ's publicly pronounced policy, because new requests for information were being made. However, the record shows that Pintail repeatedly

---

[44] R.R. at Joint Ex. 1, AR Vol. 7, Item 48, p. 5–6 (Motion to Overturn Executive Director's August 16th, 2012 Issuance of a Fifth Notice of Deficiency).
[45] *Tex. Comm'n on Envtl. Quality v. Kelsoe*, 286 SW.3d 91 (Tex. App.—Austin 2009).

failed to adequately respond to TCEQ's NOD requests, exceeding the two NOD limit for the same TCEQ requests. TCEQ should only be allowed two NODs, in accordance with its stated policy, but even if the two NOD limit was measured by the subject matter of each question asked, TCEQ still exceeded its policy. As demonstrated by the highlighted portions of Appendix A, TCEQ repeated a number of NOD requests more than twice, and Pintail did not adequately respond to the requests within the two NOD limit.

The subject matters of the lengthiest requests follow. The registration application failed to include the required construction details of subsurface supports of all storage and processing components and failed to include the required review letter from the Texas Historical Commission.[46] TCEQ's requests for both of these NOD items were made on October 27, 2011, again on February 17, 2012, and for a third time on April 12, 2012, in violation of the two NOD policy. The required information from Texas Department of Transportation was only provided after TCEQ requested it in <u>five</u> NODs. This information was requested on October 27, 2011, again on February 17, 2012, for a third time on April 12, 2012, for a fourth time on June 25, 2012, and for a fifth time on August 16, 2012. Even after all of these requests, there was still another TCEQ request for additional information,

---

[46] *See* **Appendix A**: NOD letters from TCEQ and Supplementary Information transmittal letter from Pintail dated Oct. 18, 2012. R.R. at Joint Ex. 1, AR Items 3, 13, 22, 24, 32, 39, 51).

33

which was responded to on October 18, 2012, providing a new Facility Boundary Map and new information about nearby water wells, springs, surface water bodies, and oil and gas wells. The agency should not be allowed to write Pintail's registration application for them. This registration application should have been returned.

## PRAYER

TCEQ acted in violation of its own rules and policies, and in abrogation of the due process rights of affected persons, in granting the Registration Application and issuing Registration No. 40259. Therefore, CALH and the City respectfully pray that the trial court's Judgment affirming the TCEQ's action be reversed, and that Court reverse, or suspend and set aside, the Registration and remand this matter to TCEQ for further proceedings consistent with this Court's opinion. CALH and the City further pray for all other and further relief, both general and special, at law and in equity, to which they may be justly entitled.

Respectfully submitted,

HANCE SCARBOROUGH, LLP
400 W. 15th Street, Ste. 950
Austin, TX 78701
Telephone: (512) 479-8888
Facsimile: (512) 482-6891

By: _____
Terry L. Scarborough
State Bar No. 17716000
Michael L. Woodward
State Bar No. 21979300
mwoodward@hslawmail.com
V. Blayre Pena
State Bar No. 24050372
bpena@hslawmail.com
Wesley P. McGuffey
State Bar No. 24088023
wmcguffey@hslawmail.com

ATTORNEYS FOR APPELLANTS CITIZENS
AGAINST THE LANDFILL IN HEMPSTEAD,
MICHAEL MCCALL, AND WAYNE KNOX


**KELLY HART & HALLMAN LLP**
301 Congress Avenue, Suite 2000
Austin, Texas 78701
Telephone: (512) 495-6400
Facsimile: (512) 495-6401


By: /s/ Diana Nichols
    Monica M. Jacobs
    State Bar No. 24007433
    Monica.Jacobs@kellyhart.com
    Diana L. Nichols
    State Bar No. 00784682
    Diana.Nichols@kellyhart.com

**ATTORNEYS FOR THE CITY OF
HEMPSTEAD**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Texas Rule of Appellate Procedure 9.4, I hereby certify that this brief contains 6,788 words. This is a computer generated document created in Microsoft Word, using 14 point typeface for all text, except for footnotes, which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

Terry L. Scarborough

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of Reply Brief of Appellants' was served on the following counsel of record on April 16, 2015, via certified mail, return receipt requested, and/or the electronic filing system:

Nancy Elizabeth Olinger
Nancy.Olinger@texasattorneygeneral.gov
Cynthia Woelk
Cynthia.Woelk@texasattorneygeneral.gov
Daniel C. Wiseman
Daniel.Wiseman@texasattorneygeneral.gov
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Environmental Protection Division (MC-066)
P.O. Box 12548
Austin, TX 78711-2548
**ATTORNEYS FOR TCEQ**

Paul R. Tough
ptough@msmtx.com
Brent W. Ryan
bryan@msmtx.com
MCELROY, SULLIVAN, MILLER, WEBER & OLMSTEAD, LLP
P.O. Box 12127
Austin, TX 78711

Michael S. Truesdale
LAW OFFICE OF MICHAEL S. TRUESDALE, PLLC
801 West Avenue, Suite 201
Austin, TX 78701
**ATTORNEYS FOR THE PINTAIL LANDFILL, LLC**

_Terry Scarborough_
Terry L. Scarborough

# APPENDIX A

Bryan W. Shaw, Ph.D., *Chairman*
Buddy Garcia, *Commissioner*
Carlos Rubinstein, *Commissioner*
Mark R. Vickery, P.G., *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

August 15, 2011

Mr. Ernest Kaufmann
Pintail Landfill, LLC
24644 Highway 6
Hempstead, Texas 77445

Re:     Pintail landfill Transfer Station - Waller County
        Municipal Solid Waste (MSW) - Registration No. NA
        Registration Application (RA) - Preliminary Review
        Tracking Nos. 14835575 & 14874930; RN: NA / CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed a preliminary review of the RA dated August 1, 2011, and the revisions dated August 8, 2011, for a Type V Transfer Station. Additional information is necessary to comply with the application requirements of Title 30 of the Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below must be provided prior to further application review. When making revisions to maps, drawings, and figures which are repeated throughout the application, each map, drawing, and figure must be revised throughout the application.

1.  It is not clear whether the person who signed the signature page located on page 10 of TCEQ Form No. 0650 meets the requirements of 30 TAC Section (§)305.44 (relating to Signatories to Applications). Please include documentation that the person who signs the signature page has the signing qualifications as specified in 30 TAC §305.44, §330.59(g), and Section G of TCEQ Form No. 0650.

2.  The text within the property owner affidavit located on page 9 of TCEQ Form No. 0650 has been modified to state that the property owner shall not be held responsible for the operation, maintenance, and closure and post-closure care of the facility. Please note that in accordance with 30 TAC §330.59(d)(2)(A) the property owner affidavit must include an acknowledgment that the State of Texas may hold the property owner of record either jointly or severally responsible for the operation, maintenance, and closure and post-closure care of the facility. In addition, please note that the text within the property owner affidavit should not be modified from the original text contained within page 9 of TCEQ Form No. 0650. Please resubmit a properly completed property owner affidavit with your next submittal. Please ensure that the standard text within the property owner affidavit will not be modified.

3.  Part V of the TCEQ Core Data Form (TCEQ Form No. 10400) does not include the date that the form was signed. Please revise Part V of TCEQ Form No. 10400 to include the date that the form was signed.

Mr. Ernest Kaufmann
Page 2
August 15, 2011

4. Part I of the RA does not include a listing of all permits or construction approvals received or applied for. In accordance with 30 TAC §305.45(a)(7), please revise Part I of the RA to include a listing of all permits or construction approvals received or applied for in accordance with the cited rule. For those permits listed in §305.45(a)(7), please indicate whether the applicant has applied, received approval, or whether it is not applicable.

Please submit an original and three (3) copies of the application revisions within fourteen (14) days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. Since your application is under a preliminary review, **please use the label, "Prelim-Review # (date)" in the header or footer to identify your NOD response.**

Please complete Pages 1 and 2 of the Part I Form to include with your response and mark the boxes to indicate that your response is a "Notice of Deficiency Response" for the "Registration Application." In accordance with 30 TAC §§281.5(1) and 305.44, please also include a new, original signature page, Page 10 of the Part I Form, as part of your response. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. This form and the Core Data Form are available on our Website at: http://www.tceq.state.tx.us/permitting/waste_permits/msw_permits/ perm_reg_mod.html#all.

Failure to submit the requested information will result in the application being returned to the applicant. If you have any questions, please contact me at (512) 239-2580. Please include the mail code MC 124 when you address written correspondence.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/fp

cc:     Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental

Bryan W. Shaw, Ph.D., *Chairman*
Buddy Garcia, *Commissioner*
Carlos Rubinstein, *Commissioner*
Mark R. Vickery, P.G., *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

October 27, 2011

Mr. Ernest Kaufmann
Pintail Landfill, LLC
24644 Highway 6
Hempstead, Texas 77445

Re:    Pintail Landfill Transfer Station - Waller County
       Municipal Solid Waste (MSW) - Registration No. 40259
       Registration Application (RA) – First Technical Notice of Deficiency (NOD)
       Tracking Nos. 14835575, 14874930, & 14916883; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the registration application dated August 1, 2011, and the revisions dated August 8, 2011, and August 29, 2011. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete registration application and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A.  Dated cover letter transmitting the revised RA should accompany the revised application;

B.  Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C.  The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D.  Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

**Part I and Part I Attachments**

1.  The title page of the RA and the title pages for Part I, II, III, and IV of the RA do not list the facility's MSW registration number and the city where the facility is located. In accordance with 30 TAC §330.57(g)(2), please revise the title pages stated above to ensure that the facility's MSW registration number and the city that the facility is located in shall be included. The facility referenced above has been assigned MSW registration number 40259.

2.  Upon reviewing the land use maps located on pages IIB-7 and IIB-8, it appears that some of the land area within a one mile radius of the facility property boundary has not been given a land use classification. In accordance with 30 TAC §305.45(a)(6)(B) and §330.61(g), please revise these figures to ensure that all land areas within a one mile radius of the facility shall be classified by land use (e.g., residential, commercial, agricultural, recreational, industrial, undeveloped, ect.).

P.O. Box 13087   •   Austin, Texas 78711-3087   •   512-239-1000   •   www.tceq.texas.gov

How is our customer service?    www.tceq.texas.gov/goto/customersurvey

printed on recycled paper using soy-based ink

3. The color coding used on the maps located on pages IIB-8 and IIB-9 is not legible and code distinct when reproduced on black and white photocopy machines. In accordance with 30 TAC §330.57(h)(2), please revise these maps to ensure that they will be legible and code distinct when reproduced on black and white photocopy machines.

4. The drawings contained on pages IIB-7, IIB-8, and IIB-9 do not contain a revision block and a drawing number. In addition, the scale on each of these figures does not match the description provided for each scale. In accordance with 30 TAC §330.57(h)(3), (4)(c), and (4)(e), please revise the drawings stated above to ensure that they will be submitted at a standard engineering scale and that they will contain a revision block and a drawing number.

5. The aerial photographs located on pages IIE-44 through IIE-49 do not contain a north arrow. In accordance with 30 TAC §330.57(h)(5)(a), please revise the aerial photographs stated above to ensure that they will contain a north arrow.

6. The RA does not address the requirements contained in 30 TAC §330.73, regarding additional standard permit and registration conditions for MSW facilities. Please revise the RA to include a discussion regarding all applicable regulations associated with the cited rule.

**Part II and Part II Attachments**

7. Section 2.2, Volume and Rate of Disposal, page II-4 states, "The waste acceptance rate will vary over the life of the facility depending on market conditions." Please note that the statement above does not specify the maximum waste acceptance rate for the facility. In addition, Part III, Section 4, Waste Management Unit Design, page IIIA.7, states that the maximum waste acceptance rate for the facility is approximately 94 tons per day. In accordance with 30 TAC §330.61(b)(1)(B), please revise the statements above to ensure that a consistent maximum waste acceptance rate for the facility is provided.

8. Section 2.2, Volume and Rate of Disposal, page II-4, contains a discussion regarding the regulations associated with 30 TAC §330.125(h), regarding the recordkeeping requirements associated with the annual waste acceptance rate at a MSW landfill facility. Please note that 30 TAC §330.125(h) is not applicable to MSW storage and processing facilities. Please remove all language associated with 30 TAC §330.125(h) from the RA.

9. Section 2, Waste Acceptance Plan, page II-3, states, "Non-recyclable materials will be transported to a properly permitted Type I or Type IV landfill that is located within 100 miles of the proposed facility." In addition, Section 2.3, Waste Storage and Disposal, page II-5 contains a similar statement. Please note that these statements do not clearly specify the intended destination of the nonrecyclable waste received at the facility. In accordance with 30 TAC §330.61(b)(1)(B), please revise these statements to include the name, permit number, and distance from the transfer station with respect to each landfill that the facility will use to dispose of nonrecyclable waste.

10. Part II of the RA does not indicate whether there are any hospitals within one mile of the facility. In accordance with 30 TAC §330.61(c)(4) and §330.61(g), please revise Part II of the RA to verify whether there are any hospitals located within one mile of the facility. If there are any hospitals located within one mile of the facility, please ensure to revise the land use maps in RA to depict their location.

11. The RA does not include a general location map that depicts the location and surface type of all roads within a one mile radius of the facility that will normally be used by the owner or operator for entering or leaving the facility. In accordance with 30 TAC §330.61(c)(5), please revise the RA to include a map that will depict the items mentioned above.

12. Section 12.1, Water Wells, indicates that there is a single story residential structure in the northwestern portion of the site and another single story residential structure in the west central portion of the site. It is noted that these structures are not depicted in the facility layout maps. Please note that all structures within the registration boundary must be depicted on the facility layout maps. In accordance with 30 TAC §330.61(d)(4), please revise the facility layout maps to ensure that all structures within the registration boundary are depicted.

13. Part II of the RA does not indicate whether there are any archaeological sites adjacent to the facility. In accordance with 30 TAC §330.61(c)(12), please revise all applicable parts of the RA to indicate whether there are any archaeological sites adjacent to the facility. If there are any archaeological sites adjacent to the facility, please ensure to revise the land use maps in the RA to depict their location. In addition, in accordance with 30 TAC §330.61(h)(4), please provide the proximity to any archaeologically significant sites within one mile of the facility.

14. The RA does not contain a map that clearly depicts the facility access control features. In accordance with 30 TAC §330.61(c)(11) and §330.61(d)(6), please revise the RA to include a map that will depict the facility access control features.

15. Part II of the RA does not include a response from the Texas Department of Transportation (TXDOT) regarding the applicants request for coordination. In accordance with 30 TAC §330.61(i)(4), please submit the response from TXDOT to demonstrate coordination.

16. Part II of the RA does not include a certification statement prepared, sealed, and signed by a licensed Professional Engineer (P.E.) indicating the owner/operator will obtain the appropriate Texas Pollutant Discharge Elimination System (TPDES) permit coverage when required. In accordance with 30 TAC §330.61(k)(3)(A), please revise Part II of the RA to include a certification statement requested above.

17. Section 12.2, Oil and Gas Wells, page II-21, states, "There is one existing abandoned crude oil or natural gas well within the Pintail Landfill Transfer Station boundary." But this section does not state whether this well has been properly capped, plugged, and closed in accordance with all applicable rules and regulations of the Railroad Commission of Texas. In accordance with 30 TAC §330.61(l)(2), please revise this section to include a certification statement regarding whether this well has been properly capped, plugged, and closed in accordance with the cited rule.

18. Appendix IID, Wetlands Documentation, page IID-6, located in Part II of the RA, indicates that the wetland jurisdiction determination provided in the RA is a preliminary evaluation based on aerial photograph interpretation and has not been surveyed per United State Army Corps of engineers (USACE) standards. In addition, this evaluation has identified features within the facility's registration boundary that may be classified as wetlands, but the RA does not include the information requested in 30 TAC §330.553, regarding wetlands determination. In accordance with 30 TAC §330.61(m)(2), please revise Appendix IID to

include a wetlands determination that shall address all applicable requirements contained in 30 TAC §330.553(b)(1) through (5). In addition, please submit a request for a jurisdictional determination to the USACE to verify the limits of wetland jurisdiction. Additionally, please submit to us this coordination with USACE and the jurisdictional determination from USACE.

19. The RA does not include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191, Texas Antiquities Code. In accordance with 30 TAC §330.61(o), please revise Part II of the RA to include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191.

20. Section 17.1.2, Buffer Zones, page II-26, states that, "The buffer zones between the registration boundary and the transfer station location are shown on Drawing IIA.11 – General Site Plan." Please note that upon review, Drawing IIA.11 does not depict the buffer zones for the facility. In accordance with 30 TAC §330.543(b)(1), please revise this drawing to ensure that the buffer zones for the facility are depicted.

21. The RA contains an evaluation performed by Half Associates, Inc., in Appendix IIE regarding threatened and endangered species that may be found within the registration boundary. The evaluation states that the following threatened and endangered species may be found within the registration boundary based on a preliminary review of publically available resources: Houston toad, white-faced ibis, wood stork, creek chubsucker, and the timber/canebrake rattlesnake. The evaluation states that the likelihood of occurrence for the white-faced Ibis, wood stork, and timber/canebrake rattlesnake is conditional, is based on migration patterns, and is not likely to occur within the registration boundary. In addition, the evaluation states that because limited information is available, the facility should contact the Texas Parks and Wildlife Department (TPWD) regarding the creek chubsucker and the US Fish and Wildlife Service (USFWS) regarding the Houston Toad. In accordance with 30 TAC §330.61(n)(1) and §330.551, regarding endangered and threatened species, please provide a letter from the TPWD and USFWS to verify whether any endangered or threatened species may be located within the registration boundary.

22. Part II, Section 17, Location Restrictions, includes a discussion regarding the regulations contained in 30 TAC Chapter 330, Subchapter M, regarding location restrictions. Please note that each discussion regarding the location restrictions specified in 330 TAC Chapter 330, Subchapter M should be certified by a licensed P.E. Please revise Part II, Section 17, to ensure that each discussion regarding the location restrictions specified above will be signed, sealed, and dated by a licensed P.E.

**Part III and Part III Attachments**

23. Section 2.1, Facility Access, page IIIA-2, states, "A gate constructed of suitable fencing materials will be located on the entrance road." Please note that this statement does not clearly provide a description of the facility's entrance gate. In accordance with 30 TAC §330.63(b)(1), please revise the statement above to provide a general description of the facility's entrance gate.

24. The RA does not contain a drawing depicting all dimensions associated with the floor drainage trench, drainage sump, and the secondary containment walls associated with the contaminated water tank. In accordance with 30 TAC §330.63(b)(2)(D) and (F), please revise the RA to include a drawing that will depict all of the dimensions associated with the items specified above. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

25. Drawing IIIB.2, Transfer Station Layout Plan, does not state what materials will be used to construct the contaminated water tank. In accordance with 30 TAC §330.63(b)(2)(D), please revise this drawing to include the type of materials that will be used to construct the contaminated water tank.

26. The RA does not include construction details of slab and subsurface supports of all storage and processing components. In accordance with 30 TAC §330.63(b)(2)(E), please revise the RA to include generalized construction details of slab and subsurface supports of all storage and processing components. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

27. Part III of the RA does not address the regulations contained in 30 TAC §330.63(b)(5) regarding endangered species protection. In accordance with the cited rule, please provide a discussion regarding how the facility will be designed to protect endangered species.

28. Please provide a certification statement prepared, sealed, and signed by a licensed P.E. verifying the requirements of 30 TAC §330.63(c) regarding facility surface water drainage.

29. Section 2, Closure Requirements, page IIIC-2 includes a discussion regarding the placement of closure notification signs and suitable barriers at all access points of the facility, but this discussion does not state when these items will be placed at the facility. In accordance with 30 TAC §330.461(b), the items stated above should be placed no later than 90 days prior to the initiation of a final facility closure. In accordance with the cited rule, please revise this section to include a timeframe of when the closure notification signs and suitable barriers at all access points of the facility will be placed at the facility.

30. The facility's closure plan has not addressed the regulations associated with 30 TAC §330.459(c) and (d)(2), regarding evidence of a release from an MSW unit and timeframe for the completion of closure activities, respectively. Please revise the facility's closure plan to address the cited rules.

31. The closure cost estimate located in Appendix IIID1, Closure Cost Estimate Calculations, on page IIID1-4, has not been sealed, signed, and dated by a P.E. In accordance with 30 TAC §330.57(f)(1), please revise this document to ensure that it is signed, sealed, and dated by a P.E.

32. The RA has not address all of the regulations associated with 30 TAC §330.63(j), regarding cost estimate for closure and post-closure care. In accordance with the cite rule please revise the RA to ensure that the facility will submit a copy of the documentation required to demonstrate financial assurance as specified in 30 TAC Chapter 37, Subchapter R (relating to Financial Assurance for Municipal Solid Waste Facilities) 60 days prior to the initial receipt of waste.

**Part IV and Part IV Attachments**

33. Part IV of the RA does not provide a discussion regarding the types of waste to be received, an estimate of the amount of each waste to be received daily, the maximum and average lengths of time that the recovered material will remain at the facility, and the maximum and average waste processing times. In accordance with 30 TAC §330.203(b), please revise Part IV of the RA to include a discussion regarding the items stated above.

34. Section 3, Contaminated Water Management, page IV-4, states, "Should the discharge of contaminated water be necessary, the facility will obtain specific written authorization from the TCEQ prior to discharge. Please note that in accordance with 30 TAC §330.203(e), off-site discharge of contaminated waters shall be made only after approval under the Texas Pollutant Discharge Elimination System authority. Please revise the statement above to be in compliance with the cited rule.

35. Table 5-1, page IV-8, contains references to the facility's registration number, but does not provide the facility's registration number. Please revise this table to include the facility's registration number (MSW 40259).

36. Section 6, Fire Protection Plan, page IV-9, has not demonstrated that an adequate supply of water under pressure is available for firefighting purposes. In accordance with 30 TAC §330.221(a) and (c), please revise this section to include a discussion demonstrating that an adequate supply of water under pressure is available for firefighting purposes. Please ensure to discuss the water sources, the amount of water available from each source, the location of each water source, and the amount of water pressure available for fire protection purposes. If water tanks will be used to store water, please provide the location, the volume of water that will be stored, and the water pressure available with respect to each water tank.

37. Section 7.1, Access Control, page IV-12, does not provide the construction details associated with the perimeter fence located at the registration boundary. In accordance with 30 TAC §330.223(c), please provide a discussion regarding the construction details of the perimeter fence located at the registration boundary.

38. Section 7.4, Operating Hours, page IV-14, states that the Pintail Landfill Transfer Station is authorized for waste acceptance from 7 a.m. to 7 p.m., Monday through Saturday and authorized for facility operations from 5 a.m. to 9 p.m., Monday through Saturday. Please note that the waste acceptance and operating hours specified above are not in compliance with 30 TAC §330.229(a), regarding operating hours. In accordance with the cited rule please revise the facility waste acceptance and operating hours to ensure that waste acceptance hours will be any time between the hours of 7:00 a.m. and 7:00 p.m., Monday through Friday, and that the facility operating hours will be any time between the hours of 5:00 a.m. and 9:00 p.m., Monday through Friday.

39. The RA does not address the regulations associated with 30 TAC §330.203(c), regarding waste acceptance and analysis; 30 TAC §330.205, regarding facility-generated wastes; 30 TAC §330.207(f), regarding wastewater discharge; 30 TAC §330.229(b) and (c), regarding waste acceptance hours; and 30 TAC §330.245(a), (b), (d), (f), (h), (i), and (j), regarding ventilation and air pollution control. Please revise Part IV of the RA to include a discussion regarding the regulations stated above.

Mr. Ernest Kaufmann
Page 7
October 27, 2011

Please submit an original and three (3) copies of your application revisions within 54 days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, **"Tech-Revision # (date)" to identify your NOD response**. In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

Please note we do not anticipate granting an extension of time to fulfill this request. Also, please be aware a third notice of technical deficiency will not be issued.

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza Jr

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/sm

cc:     Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield

Bryan W. Shaw, Ph.D., *Chairman*
Buddy Garcia, *Commissioner*
Carlos Rubinstein, *Commissioner*
Mark R. Vickery, P.G., *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

February 17, 2012

Mr. Ernest Kaufmann
Pintail Landfill, LLC
24644 Highway 6
Hempstead, Texas 77445

Re:   Pintail Landfill Transfer Station - Waller County
      Municipal Solid Waste (MSW) - Registration No. 40259
      Registration Application (RA) – First Technical Notice of Deficiency (NOD)
      Tracking No. 151850663; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the RA dated August 1, 2011, and the revisions dated August 8, 2011, August 29, 2011, November 16, 2011, and January 18, 2012. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 of the Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete RA and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A.   Dated cover letter transmitting the revised RA should accompany the revised application;

B.   Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C.   The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D.   Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

## Part I and Part I Attachments

1.   It is noted that the current submittal contained four redline/strikeout copies. Please note that all revised registration applications should include one original, two unmarked copies, and one marked copy (such as a redline/strikeout version). Please provide one original and two unmarked copies of the January 18, 2012, submittal with your next response.

2.   Page 3 of the Texas Commission on Environmental Quality (TCEQ) Part 1 Form (TCEQ Form No. 0650) states that the information regarding the public place where the administratively complete RA will be located is not applicable. It is noted that the revised Notice of Application and Opportunity to Request a Public Meeting that the facility published states that the RA is available for viewing and copying at the Waller County Clerk's Office. Please revise page 3 of the TCEQ Form No. 0650 to include the information regarding the public place where the administratively complete registration application will be located.

Mr. Ernest Kaufmann
Page 2
February 17, 2012

**Part II and Part II Attachments**

3. Our concerns listed in NOD Comment No. 15 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, Part II of the RA does not include a response from the Texas Department of Transportation (TXDOT) regarding the applicants request for coordination. In accordance with 30 TAC §330.61(i)(4), please submit the response from TXDOT to demonstrate coordination. Please ensure to provide documentation that TXDOT has reviewed the new location of the facility's site entrance.

4. Our concerns listed in NOD Comment No. 19 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, the RA does not include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191, Texas Antiquities Code. In accordance with 30 TAC §330.61(o), please revise Part II of the RA to include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191.

5. Part II, Section 1.1, Existing Conditions, page II-1, states that the "Proposed registration boundary is outside the City of Hempstead city limits and outside its extraterritorial jurisdiction." It is noted that the RA does not include a map depicting the City of Hempstead city limits and extraterritorial jurisdiction. Please revise Part II of the RA to include a map depicting the City of Hempstead city limits and extraterritorial jurisdiction.

6. Our concerns listed in NOD Comment No. 18 of our October 27, 2011 letter, have not been adequately addressed. Part II, Appendix IID, Wetlands Documentation, page IID-168, states that the facility has requested a preliminary jurisdictional determination from the United States Army Corps of Engineers (USACE). It is noted that the RA does not include documentation regarding the USACE jurisdictional determination. Please ensure to include all documentation regarding coordination with USACE and the jurisdictional determination from USACE with your next submittal.

7. Part II, Appendix IID, Wetlands Documentation, provides information regarding the delineation of wetlands and waters of the United States (US) within the property boundary. Upon review, it is not clear whether any of the delineated wetlands and waters of the US will be impacted during the construction of the transfer station and internal facility roadways. To clarify whether any of the delineated wetlands and waters of the US will be impacted, please revise Part II of the RA to include a drawing depicting the transfer station, internal facility roadways, wetlands, waters of the US, and the registration boundary. Additionally, please provide a discussion regarding whether any wetlands and waters of the US will be altered during the construction of the facility.

8. Part II, Appendix IIE, Appendix IIE, Endangered or Threatened Species Documentation, page IIE-71 and 72, both state that, "Because of the incidental chance for occurrence and because the suitable habitat occurs in areas (i.e. south central pond/wetland complex) that will not be impacted by the landfill, the landfill project will not cause or contribute to taking of the White Faced Ibis . . . . [and the] Wood Stork." In addition, Part II, Appendix IIE, Appendix IIE, page IIE-74 states, "However, because suitable habitat for the timber rattlesnake occurs in portions of the study area (i.e. forested areas near permanent water sources) that will not be impacted by the landfill, the landfill project will not cause or contribute to taking of the Timber Rattlesnake." Please note that the RA has not clearly identified the locations of the potential habitats for the White Faced Ibis, Wood Stork, and Timber Rattlesnake. Please provide a drawing showing the locations of the potential habitats for the White Faced Ibis, Wood Stork, and Timber Rattlesnake. Please ensure that this drawing will also depict the transfer station, internal facility roadways, and the registration boundary.

Mr. Ernest Kaufmann
Page 3
February 17, 2012

**Part III and Part III Attachments**

9. Our concerns listed in NOD Comment No. 24 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, the RA does not contain a drawing depicting all dimensions associated with the floor drainage trench and drainage sump. In accordance with 30 TAC §330.63(b)(2)(D) and (F), please revise the RA to include a drawing that will depict all of the dimensions associated with the items specified above. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

10. Our concerns listed in NOD Comment No. 25 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, Drawing IIIB.2, Transfer Station Layout Plan, does not state what materials will be used to construct the contaminated water tank. In accordance with 30 TAC §330.63(b)(2)(D), please revise this drawing to include the type of materials that will be used to construct the contaminated water tank.

11. Our concerns listed in NOD Comment No. 26 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, the RA does not include construction details of slab and subsurface supports of all storage and processing components. In accordance with 30 TAC §330.63(b)(2)(E), please revise the RA to include generalized construction details of slab and subsurface supports of all storage and processing components. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

12. Our concerns listed in NOD Comment No. 27 of our October 27, 2011 letter, have not been adequately addressed. It is noted that Part II, Appendix IIE, Endangered or Threatened Species Documentation, has identified several locations within the registration boundary that may be potential habitats for the following endangered and/or threatened species: the white-face ibis, the wood stork, the creek chubsucker, and the timber rattlesnake. Please note that Part III of the RA does not address the regulations contained in 30 TAC §330.63(b)(5) regarding endangered species protection. In accordance with the cited rule, please provide a discussion regarding how the facility will be designed to protect the potential habitats of the endangered and/or threatened species mentioned above.

13. In response to NOD Comment No. 30 of our October 27, 2011 letter, the facility stated that the requirements of 30 TAC §330.459(c) are not applicable because they will only accept construction and demolition waste. Please note the requirements of 30 TAC §330.459(c) are applicable to all MSW storage and processing facilities. As stated previously, the facility's closure plan has not addressed the regulations associated with 30 TAC §330.459(c), regarding evidence of a release from an MSW unit. Please revise the facility's closure plan to address the cited rule.

14. Part III, Appendix IIID2, page IIID2-1, states, "After the registration application is approved by TCEQ, Pintail Landfill, LLC will file the required financial assurance. A copy of the required documentation will be submitted to the executive director of the TCEQ within 60 days from issuance of the registration." Please note that in accordance with 30 TAC §330.63(j), the facility is required to submit a copy of the documentation required to demonstrate financial assurance as specified in 30 TAC Chapter 37, Subchapter R (relating to Financial Assurance for MSW Facilities) 60 days prior to the initial receipt of waste. Please revise the statement above to ensure that the facility will submit a copy of the documentation required to demonstrate financial assurance as specified in 30 TAC Chapter 37, Subchapter R, 60 days prior to the initial receipt of waste.

15. The closure cost estimates provided in Part III, Appendix IIID, Table IIID-1 and Appendix IIID1, page IIID1-4 do not include the cost for disposal of the contaminated water contained in the 5,000 gallon contaminated water storage tank. In accordance with 30 TAC §330.505, Closure Cost Estimates for Storage and Processing Units, please revise the closure cost estimates for the facility to ensure that they will include the cost for disposal of the contaminated water contained in the 5,000 gallon contaminated water storage tank.

16. Part III, page IIIA-4, states, "A water supply required to clean the tipping floor will be provided by a nearby water well and/or a pressurized tank. Hose bibs and hoses located on the west and north walls of the building will be used to wash down the concrete tipping floor." Please note that Part III of the RA does not include information regarding the pressurized water tank. In accordance with 30 TAC §330.63(b)(2)(D), please provide the generalized construction details associated with the pressurized water tank. Please ensure to discuss the tank volume and what materials will be used to construct the tank. In addition, in accordance with 30 TAC §330.63(b)(2)(B), please include the location of the pressurized water tank on the facility's Site Layout Plan.

17. Our concerns listed in NOD Comment No. 36 of our October 27, 2011 letter, have not been adequately addressed. As stated previously, Section 6, Fire Protection Plan, page IV-9, has not demonstrated that an adequate supply of water under pressure is available for firefighting purposes. In accordance with 30 TAC §330.221(a) and (c), please revise this section to include a discussion demonstrating that an adequate supply of water under pressure is available for firefighting purposes. Please ensure to discuss the water sources, the amount of water available from each source, the location of each water source, and the water under pressure available for fire protection purposes. If water tanks will be used to store water, please provide the location, the volume of water that will be stored, and the water pressure available for firefighting purposes. Also, please ensure to discuss why the supply of water under pressure at the facility is adequate for firefighting purposes.

## Part IV and Part IV Attachments

18. Part IV, Section 2.2, page IV-3, states, "If waste is stored, it will be stored in the transfer station building or in securely covered transfer trailers and/or roll-off boxes located within the building or parked in the designated parking area outside the building." Please note that the location(s) where waste will be stored outdoors has not been depicted in the facility's site layout plan. In accordance with 30 TAC §330.63(b)(2)(B), please revise Drawing IIIB.2, Transfer Station Layout Plan, to ensure that all location(s) where waste will be stored outdoors are depicted.

19. Our concerns listed in NOD Comment No. 37 of our October 27, 2011 letter, have not been adequately addressed. It is noted that Part IV, Section 7.1.1, page IV-12, states, "The property will be fenced at the transfer station's registration boundary with barb wire fencing on all sides." Please note that in accordance with 30 TAC §330.223(c), access to the facility must be controlled by a perimeter fence, consisting of a four-foot barbed wire fence or a six-foot chain-link fence or equivalent, and have lockable gates. Please note that the statement provided above does not include a description regarding the height of the barbed wire fence. In accordance with the cited rule, please revise the statement above to include the height of the facility perimeter fence and specify whether the fence will include lockable gates. In addition, it is noted that Drawing IIA.11 states, "Access control will be provided by fence along registration boundary or property boundary." Please note that the location of the perimeter fence stated in Drawing IIA.11 is not consistent with the location provided in Part IV, Section 7.1.1, page IV-12. Please revise these documents to ensure that they will include consistent information regarding the location of the facility perimeter fence.

20. Our concerns listed in NOD Comment No. 38 of our October 27, 2011 letter, have not been adequately addressed. Part IV, Section 7.4, Operating Hours, page IV-14, states, "The Pintail Landfill Transfer Station is authorized for waste acceptance from 3:00 a.m. to 5 p.m., Monday through Friday and from 3:00 a.m. to 1:00 p.m. on Saturday. . . . The Pintail Landfill Transfer Station is authorized for facility operations 24 hours per day, 7 days a week." Please note that the waste acceptance and operating hours specified above are not in compliance with 30 TAC §330.229(a), regarding operating hours. In accordance with the cited rule please revise the facility waste acceptance and operating hours to ensure that waste acceptance hours will be any time between the hours of 7:00 a.m. and 7:00 p.m., Monday through Friday, and that the facility operating hours will be any time between the hours of 5:00 a.m. and 9:00 p.m., Monday through Friday. Please note that if the facility would like to request alternative waste acceptance and operating hours from the hours specified in 30 TAC §330.229(a), they must include justification regarding why alternative waste acceptance and operating hours are necessary. If the facility would like to request alternative waste acceptance and operating hours, please revise this section to include justification regarding why alternative waste acceptance and operating hours are necessary.

In addition, it is not clear what measures will be implemented at the facility to reduce the noise that will be created due to the proposed alternative waste acceptance and operating hours. Please provide a discussion regarding what measures will be implemented to reduce the noise that may be created from the proposed alternative waste acceptance and operating hours.

21. In response to NOD Comment No. 39 of our October 27, 2011 letter, the facility states, "§330.203(c) and 330.205(a) . . . are not applicable since the Pintail Landfill Transfer Station will accept only construction and demolition wastes that will not require sampling, testing, and specifications of waste characteristics. The facility will not generate wastes". Please note that although the requirements of 30 TAC §330.203(c) and §330.205(a) may not be applicable to the construction and demolition wastes received, this rule is applicable to the contaminated water (i.e. wash water) generated by the facility. Please revise Part IV of the RA to include a discussion regarding the regulations contained in 30 TAC §330.203(c) and §330.205(a) regarding facility generated waste.

22. Our concerns listed in NOD Comment No. 39 of our October 27, 2011 letter, have not been adequately addressed. Please note that the RA does not address the regulations associated with 30 TAC §330.245(b) and (j), regarding ventilation and air pollution control. Please revise Part IV of the RA to include a discussion regarding the regulations stated above.

Please submit an original and three (3) copies of your application revisions within 30 days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, "Tech-Revision # (date)" to identify your NOD response. In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

Please note we do not anticipate granting an extension of time to fulfill this request. Also, please be aware a third notice of technical deficiency will not be issued.

Mr. Ernest Kaufmann
Page 6
February 17, 2012

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/sm

cc:     Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield

Buddy Garcia, *Chairman*
Larry R. Soward, *Commissioner*
Bryan W. Shaw, Ph.D., *Commissioner*
Mark R. Vickery, P.G., *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

April 12, 2012

Mr. Ernest Kaufmann
Manager
Pintail Landfill, LLC
24644 Highway 6
Hempstead, Texas 77445

Re:   Pintail Landfill Transfer Station - Waller County
      Municipal Solid Waste (MSW) - Registration No. 40259
      Registration Application (RA) – Technical Notice of Deficiency (NOD)
      Tracking No. 15522621; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the RA dated August 1, 2011, and the revisions dated August 8, 2011, August 29, 2011, November 16, 2011, January 18, 2012, and March 15, 2012. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 of the Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete RA and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A.   Dated cover letter transmitting the revised RA should accompany the revised application;

B.   Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C.   The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D.   Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

**Part II and Part II Attachments**

1.   Our concerns listed in NOD Comment No. 3 of our February 17, 2012 letter, have not been adequately addressed. As stated previously, Part II of the RA does not include a response from the Texas Department of Transportation (TXDOT) regarding the applicants request for coordination. In accordance with 30 TAC §330.61(i)(4), please submit the response from TXDOT to demonstrate coordination. Please ensure to provide documentation that TXDOT has reviewed the new location of the facility's site entrance.

2.   Our concerns listed in NOD Comment No. 4 of our February 17, 2012 letter, have not been adequately addressed. As stated previously, the RA does not include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code,

Chapter 191, Texas Antiquities Code. In accordance with 30 TAC §330.61(o), please revise Part II of the RA to include a review letter from the Texas Historical Commission documenting compliance with the Natural Resources Code, Chapter 191.

**Part III and Part III Attachments**

3. Our concerns listed in NOD Comment No. 11 of our February 17, 2012 letter, have not been adequately addressed. As stated previously, the RA does not include construction details of subsurface supports of all storage and processing components. Please revise the RA to include a statement verifying whether there are any subsurface supports associated with the facility. In accordance with 30 TAC §330.63(b)(2)(E), if there are any subsurface supports associated with the transfer station, please revise the RA to include generalized construction details of all subsurface supports associated with the facility. Please ensure that the drawings shall depict key cross sectional and plan views for all items specified above.

4. The closure cost estimates provided in Part III, Appendix IIID1, page IIID1-4 provides a lump sum of $5,000 for general cleanup. The RA states that this includes washdown and disinfection of the facility as well as disposal of the contaminated water. Please revise the closure cost estimate calculations on page IIID1-4, to provide at a minimum, a separate line item estimate of the cost associated with washdown, disinfection, disposal of contaminated water, and the transportation costs associated with disposal of the contaminated water.

5. In response to NOD Comment No. 15 of our February 17, 2012 letter, the facility provided a cost estimate for the disposal of contaminated water at $0.05 per gallon. Please provide verification from an independent 3rd party processor that includes the unit cost for disposal of contaminated water that is provided in the facility's closure cost estimate. Please ensure that the information provided will include the unit cost for disposal of the contaminated water quoted in the facility's closure cost estimate, shall be signed by the person who provided the estimate, and will include the person's contact information.

**Part IV and Part IV Attachments**

6. Part IV, Section 2.2, Volume and Rate of Transfer, page IV-3, states, "If waste is stored, it will be stored in the transfer station building or in securely covered transfer trailers and/or roll-off boxes located within the building or parked in the designated parking area outside the building." It appears that the facility is proposing to store C & D waste in transfer trailers and/or roll-off boxes outdoors. Please verify whether C & D waste will be stored outdoors in the transfer trailer/roll-off storage area. In addition, if waste will be stored outdoors, please revise the RA to include a discussion regarding how the outdoor waste storage units and area will be in compliance with 30 TAC §330.63(b)(2)(D), general construction details; 30 TAC §330.63(b)(4), water pollution control; 30 TAC §330.63(d), waste management unit design; and 30 TAC §330.207, contaminated water management.

7. Part IV, Section 3, Contaminated Water Management, page IV-4, states, "The contaminated water will then be transported offsite for treatment, testing, and disposal at a publicly owned treatment works (POTW) or a properly permitted treatment facility in accordance with its sampling and analysis plan." The RA does not specify which facility will be used to treat and dispose of the contaminated water generated onsite. In accordance with 30 TAC §330.205(a) and (b), please provide the name and permit number of the treatment facility that will be used to treat and dispose of the contaminated water generated onsite. In

addition it is not clear whether the contaminated water generated onsite will be sampled and analyzed in accordance with 30 TAC §330.203(c)(2). Please revise this section to ensure that: at a minimum, effluent from the facility will be analyzed annually for TPH, fats, oil and grease, and pH; records of each analysis will be maintained at the facility for a minimum of three years; and that all sampling and analysis shall be done according to EPA-approved methods.

8.  The RA does not specify how often the contaminated water contained within the 5,000 gallon contaminated water storage tank will be disposed. In accordance with 30 TAC §330.205, please revise Part IV, Section 3, Contaminated Water Management, to specify how often the contaminated water contained within the 5,000 gallon contaminated water storage tank will be disposed.

9.  Part IV, Section 4.1, states, "All solid wastes will be stored in a manner to prevent fires, ensure safety, control animals, control vectors, and contained to prevent windblown solid waste and litter." Please note that the statement above does not include procedures regarding how the facility will ensure that these requirements are achieved. In accordance with 30 TAC §330.65(a) and §330.209(b), please revise this section to include procedures regarding how odors, vectors, and windblown waste will be managed from all on-site waste and recyclable material storage areas.

10. Part IV, Section 7.14, Employee Sanitation Facilities, page IV-19, states that, "Sanitary facilities are provided for all employees and visitors at the transfer station . . . Portable sanitary facilities will be provided." It appears that all onsite domestic wastewater will be managed by a private contractor. Please clarify whether the private contractor will remove and properly disposed of all onsite domestic wastewater. In addition, please certify that domestic wastewater will not be placed in the facility's contaminated water tank.

11. Part IV, Section 7.6, page IV-15, states, "The facility will provide litter control devices, as necessary, at appropriate locations near the tipping floor and elsewhere. The litter control devices will be constructed of appropriate materials for the control of windblown material and liter." Please note that the RA does not specify what devices will be used to control windblown material and litter, and does not describe when these devises will be implemented. In accordance with 30 TAC §330.233(a)(1), please revise this section to provide a discussion regarding what devices will be used to control windblown material and litter; and the procedures of when these devices will be implemented.

12. Part IV, Section 8.1, Personnel, page IV-21, describes the role of the landfill manger in relation to the transfer station. Please note that the facility has submitted a RA for the construction and operation of a transfer station and all information in the RA should be pertaining to the transfer station. As such, please ensure that all information regarding the landfill manger is removed from the RA.

13. Part IV, Section 9.2.3, Facility Entrance Road, page IV-28, states, "Roadways are one way to expedite traffic flow." Please note that Figure IIIB.1, General Site Plan, and Figure IIIB.4, Waste Processing Plan, depict the internal facility roadways as a two lane road and not two separate one way roads. Please revise the statement above to reflect the type of road that will be used for the internal facility roadways.

Mr. Ernest Kaufmann
Page 4
April 12, 2012

Please submit an original and three (3) copies of your application revisions within 30 days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, "**Tech-Revision # (date)**" to identify your NOD **response**. In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/sdm

cc: Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield

Bryan W. Shaw, Ph.D., *Chairman*
Carlos Rubinstein, *Commissioner*
Toby Baker, *Commissioner*
Zak Covar, *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

June 25, 2012

Mr. Ernest Kaufmann
Manager
Pintail Landfill, LLC
P.O. Box 969
Hempstead, Texas 77445

Re: Pintail Landfill Transfer Station – Waller County
  Municipal Solid Waste (MSW) - Registration No. 40259
  Registration Application (RA) – Technical Notice of Deficiency (NOD)
  Tracking No. 15897509; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the RA dated August 1, 2011, and the revisions dated August 8, 2011, August 29, 2011, November 16, 2011, January 18, 2012, March 15, 2012, and May 31, 2012. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 of the Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete RA and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A. Dated cover letter transmitting the revised RA should accompany the revised application;

B. Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C. The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D. Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

## Part II and Part II Attachments

1. Part II, Appendix C, Texas Department of Transportation (TXDOT) Documentation, contains an April 24, 2012, letter from TXDOT regarding the applicants request for coordination. This letter states, "We have subsequently received a letter from Lee Engineering Dated March 13, 2012, requesting information regarding SH 6 and US 290 . . . and we are working to compile information related to the roadway geometrics and historical traffic counts. . . . To this point, we have not received any formal traffic impact study or application for access permits to the site. Prior to making any determination on potential traffic impacts of this proposed facility, our agency will require a full Traffic Impact Assessment from the applicant." Please note that we cannot declare the RA technically complete until TXDOT provides a determination regarding potential traffic impacts for this

site. Please revise the RA to include the Traffic Impact Assessment Report requested by TXDOT and their response to this report. In addition, please ensure that the RA will include all additional correspondence with TXDOT.

Please submit an original and three (3) copies of your application revisions within 30 days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, "**Tech-Revision # (date)" to identify your NOD response**. In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/sdm

cc:     Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield

Bryan W. Shaw, Ph.D., *Chairman*
Carlos Rubinstein, *Commissioner*
Toby Baker, *Commissioner*
Zak Covar, *Executive Director*



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

August 16, 2012

Mr. Ernest Kaufmann
Manager
Pintail Landfill, LLC
P.O. Box 969
Hempstead, Texas 77445

Re:     Pintail Landfill Transfer Station - Waller County
        Municipal Solid Waste (MSW) - Registration No. 40259
        Registration Application (RA) – Technical Notice of Deficiency (NOD)
        Tracking No. 15987368; RN106192735/CN603939349

Dear Mr. Kaufmann:

The MSW Permits Section has completed the review of the RA dated August 1, 2011, and the revisions dated August 8, 2011, August 29, 2011, November 16, 2011, January 18, 2012, March 15, 2012, May 31, 2012, and July 20, 2012. The application was prepared by Biggs and Mathews Environmental and submitted on behalf of Pintail Landfill, LLC. Additional information must be presented to demonstrate compliance with Title 30 of the Texas Administrative Code (30 TAC) Chapter 305 and Chapter 330. The information requested below is necessary for a complete RA and must be addressed prior to further technical review. When making revisions to maps, drawings, and figures which are replicated throughout the application, each map, drawing, and figure needs to be revised throughout the application.

A.  Dated cover letter transmitting the revised RA should accompany the revised application;

B.  Each item of concern should be addressed in the transmittal letter and the applicant's response to the item should be immediately following the item of concern;

C.  The applicant should indicate where in the revised RA the revisions have been made by reference to part, section, and page number; and

D.  Please include an original certification statement with the revision, in accordance with 30 TAC Section (§)305.44. The certification statement should indicate the name, title, and address of the responsible official.

## Part II and Part II Attachments

1.  Part II, Appendix C, Texas Department of Transportation (TXDOT) Documentation, contains a June 25, 2012, Traffic Impact Analysis associated with the permit application that was submitted for MSW 2377, Pintail Landfill. This report contains extensive information regarding the traffic that will be generated by the proposed landfill and does not include a separate discussion regarding the proposed transfer station. In accordance with 30 TAC §330.61(i)(4), please revise Part II of the RA to include documentation of coordination with TXDOT for traffic and location restrictions concerning the proposed transfer station. Please ensure that the information submitted to TXDOT will address all applicable information contained in 30 TAC §330.61(i), regarding Transportation.

Please submit an original and three (3) copies of your application revisions within 30 days of the date of this letter. Your response must be in a form that allows for the replacement of application pages with the revised pages. According to 30 TAC §330.57(g)(6), revisions must have a revision date and note that the sheet is revised in the header or footer of each revised sheet or page. The revised text must be marked to highlight the revision. Since your application is under technical review, please use the label, "Tech-Revision # (date)" to identify your NOD response. In accordance with 30 TAC §305.44, please include an original certification statement with the revision. Along with the original signature, the certification statement should indicate the name, title, and address of the responsible official. Failure to submit a satisfactory response to each of the noted deficiencies may result in the application being returned due to technical deficiencies.

If you have any questions, please contact me at (512) 239-2580. When addressing written correspondence, please use mail code MC 124.

Sincerely,

Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section
Waste Permits Division
Texas Commission on Environmental Quality

RM/pt

cc:    Mr. Kenneth J. Welch, P.E., Biggs & Mathews Environmental, Mansfield



**BIGGS & MATHEWS ENVIRONMENTAL** RECEIVED
*Consulting Engineers • Hydrogeologists*
Mansfield • Wichita Falls

NOV 05 2012
WASTE PERMITS DIVISION
TEXAS COMMISSION ON
ENVIRONMENTAL QUALITY

October 18, 2012

Mr. Ruben Meza, Jr., Engineering Specialist
Municipal Solid Waste Permits Section (MC-124)
Texas Commission on Environmental Quality
P.O. Box 13087
Austin, TX 78711-3087

Re:   Pintail Landfill Transfer Station – Waller County, Texas
       Municipal Solid Waste (MSW) Registration No. 40259
       Registration Application (RA) – Supplementary Information
       Tracking No. 15987368; RN106192735/CN603939349

Dear Mr. Meza:

This supplementary information is submitted on behalf of Pintail Landfill, LLC. The Registration Application for the proposed Pintail Landfill Transfer Station has been revised as discussed. One original and three copies (one redline, two clean) are enclosed with this letter. A description of the supplementary information is presented below.

1.   A final signed and sealed drawing of the registration boundary is provided. The final registration boundary drawing, identified as Drawing IC.1 – Pintail Facility Boundary Map, has been replaced to include the final boundary drawing.

2.   A permanent site benchmark has been established inside the Registration boundary. Two drawings depicting the permanent benchmark (Drawing IIA.11 – General Site Plan and Drawing IIIB.1 – General Site Plan) have been revised to show the site benchmark location that is within the Registration boundary.

3.   The well information provided in the registration has been updated. Revisions are provided to Part II, Section 8.1 – Wells within 500 Feet; Section 8.2 – Wells, Springs and Surface Water Bodies or other Water in the State within One Mile; Section 12.1 – Water Wells; and Section 12.2 – Oil and Gas Wells.

We trust this supplemental information is satisfactory to you and meets the rules and regulations of the TCEQ. If you need additional information, please let us know.

Sincerely,

BIGGS & MATHEWS ENVIRONMENTAL
TBPE No. F-256 ◆ TBPG No. 50222

Kenneth J. Welch, P.E.
Principal Engineer

DUE DATE   12-5-2012
ARTS #   14922/06( 16502866)
PM   R Meza
CR   11/7/12

Attachments:   Part I Form – pages 1, 2 and 10
                Revised Transfer Station Registration Application (original plus three copies)

cc:   Pintail Landfill, LLC, c/o Mr. Ernest Kaufmann, President, Green Group Holdings, LLC

1700 Robert Road, Suite 100 ◆ Mansfield, Texas 76063 ◆ Phone: 817-563-1144 ◆ Fax: 817-563-1224

# APPENDIX B

# Texas Commission on Environmental Quality



<mark>Permit</mark> for Municipal
Solid Waste (MSW) Management Site
Issued under provisions of Texas
Health & Safety Code
Chapter 361

| | |
|---|---|
| MSW Permit No.: | 2382 |
| Name of Site Operator/Permittee: | Netex Composting Inc. |
| Property Owner: | Thomas Leslee Rawson |
| Facility Name: | Stouts Creek Compost |
| Facility Address: | 1000 CR 3372<br>Pickton, TX 75471 |
| Classification of Site: | <mark>Type V Resource Recovery/Composting (RC) Facility</mark> |
| Wastes to be Accepted: | Municipal sewage sludge, septage, grease trap waste, biosolids, and wood chips. |

The <mark>permittee is authorized to store and process wastes, compost, and recycle recovered materials</mark> in accordance with the limitations, requirements, and other conditions set forth herein. This permit is granted subject to the rules and Orders of the Commission and laws of the State of Texas. Nothing in this permit exempts the permittee from compliance with other applicable rules and regulations of the Texas Commission on Environmental Quality. This permit will be valid until canceled, amended, or revoked by the Commission.

*Approved, Issued and Effective* in accordance with Title 30 Texas Administrative Code (30 TAC) Chapter 330 and 332.

Issued Date: May 1, 2014

For the Commission

**Netex Composting Inc.
Stouts Creek Compost
MSW Permit No. 2382**

## Table of Contents

I. Size and Location of Facility ........................................................................................3

II. Facilities and Operations Authorized ........................................................................3

III. Facility Design, Construction, and Operation...........................................................4

IV. Financial Assurance .....................................................................................................5

V. Facility Closure............................................................................................................5

VI. Standard Permit Conditions .......................................................................................6

VII. Incorporated Regulatory Requirements .....................................................................7

VIII. Special Permit Provisions ...........................................................................................7

IX. ATTACHMENT A.......................................................................................................7

X. ATTACHMENT B.......................................................................................................7

## I. Size and Location of Facility

A. This MSW Type V Compost Facility is located in Hopkins County, approximately 1.0 mile east from the intersection of Farm to Market 269 and County Road 3372. The facility contains 3.82 acres.

B. The legal description is contained in Part I of the application.

C. Coordinates and Elevation of Site Permanent Benchmark:

Latitude: 33.116083 N
Longitude: -95.368043 W
Elevation: 500 feet above mean sea level (msl)

## II. Facilities and Operations Authorized

A. Days and Hours of Operation

The waste acceptance and operating hours for the receipt and processing of compost feedstock at this facility shall be any time between 5:00 a.m. to 9:00 p.m. Monday through Sunday. The waste acceptance and operating hours at this facility include the use of heavy equipment.

The permittee shall post the actual operating hours on the site sign.

B. Wastes Authorized at this Facility

The permittee is authorized to store and compost municipal sewage sludge, septage, grease trap waste, wood chips, biosolids, and food residuals as detailed in the application.

C. Wastes Prohibited at This Facility

Grit trap waste, chemical toilet waste, regulated hazardous waste, materials listed under Section 332.45(10), and any material not addressed under the waste acceptance plan for the facility.

D. Waste Acceptance Rates

Biosolid waste may be accepted for composting at this facility at a rate of up to 4000 gallons-per-day. Liquid waste (grease trap and/or septic waste combined total) may be accepted for composting at this facility at a rate of up to 54,000 gallons-per-day. Bulking material may be accepted for composting at this facility at a rate of up to 7.6 cubic yards per day.

E.     Maximum Volumes Available for Storage

Total available liquid waste storage capacity of this facility is 54,000 gallons and total solid waste storage capacity is 126 cubic yards. The maximum storage limit for untreated waste materials is 72 hours.

F.     Facilities Authorized

The permittee is authorized to operate the facilities related to the composting and storage of the wastes authorized, and related to the composting of the recovered materials, which shall include units, structures, appurtenances, or improvements as described in permit application.

G.     Changes, Additions, or Expansions

Any proposed facility changes must be authorized in accordance with TCEQ rules in 30 TAC Chapter 332 (Composting), 30 TAC Chapter 330 (Municipal Solid Waste) as applicable and 30 TAC Chapter 305 (Consolidated Permits).

## III.     Facility Design, Construction, and Operation

A.     Facility design, construction, and operation must comply with this permit, Commission Rules, including composting requirements cited in 30 TAC Sections (§§)330.59 through 330.65, Chapter 332 Subchapters D through G and Sections 332.4 through 332.8; Special Provisions contained in this permit, and the permit application.

B.     The entire waste management facility shall be designed, constructed, operated, and maintained to prevent the release and migration of any waste, contaminant, or pollutant, and to prevent inundation or discharge from the areas surrounding the facility components. This site must be designed, constructed and maintained to collect spills and incidental precipitation in such a manner as to:

1.     preclude the release of any contaminated runoff or spills; and

2.     prevent washout of any waste by a 100-year storm.

C.     The site shall be designed and operated so as not to cause a violation of:

1.     the requirements of the Texas Water Code, §26.121;

2.     any requirements of the Federal Clean Water Act, including, but not limited to, the National Pollutant Discharge Elimination System (NPDES) requirements, §402 as amended;

3.     the requirements under the Federal Clean Water Act, §404, as amended; and

4.    any requirement of an area wide or statewide water quality management plan that has been approved under the Federal Clean Water Act, §208 or §319, as amended.

D.    All facility employees and other persons involved in facility operations shall be qualified, trained, and experienced to perform their duties so as to achieve compliance with this permit. The permittee shall further ensure that personnel are familiar with safety procedures, contingency plans, the requirements of the Commission's rules, and this permit, commensurate with their levels and positions of authority. The permittee shall employ at least one licensed individual in accordance with 30 TAC §30.213 (Classification of MSW Facilities and Level of License Required).

## IV. Financial Assurance

A.    Authorization to operate the facility is contingent upon compliance with provisions contained within the permit and maintenance of financial assurance in accordance with 30 TAC Chapter 330 Subchapter K and 30 TAC Chapter 37.

B.    Within 60 days after the date of issuance of this permit, the permittee shall provide financial assurance instrument(s) for demonstration of closure of the facility in accordance with 30 TAC §330.505(a). The closure cost estimate of $547,736 (2013 dollars) is based on estimates as described in Part III, Section 16 of the permit application.

C.    The permittee shall annually adjust the closure cost estimate for inflation within 60 days prior to the anniversary date of the establishment of the financial assurance instrument pursuant to 30 TAC §330.505.

D.    If the facility's closure plan is modified in accordance with §305.70, the permittee shall provide new cost estimates in current dollars in accordance with 30 TAC Chapter 37 and 30 TAC §330.505. The amount of the financial assurance mechanism shall be adjusted within 45 days after the modification is approved. Adjustments to the cost estimates and/or financial assurance instrument to comply with any financial assurance regulation that is adopted by the TCEQ subsequent to the issuance of this permit shall be initiated as a modification within 30 days after the effective date of the new regulation.

## V. Facility Closure

Closure shall commence:

A.    Upon direction by the Executive Director of the TCEQ for failure to comply with the terms and conditions of this permit or violation of State or Federal regulations.

The Executive Director is authorized to issue emergency orders to the permittee in accordance with §§5.501 and 5.512 of the Texas Water Code regarding this matter after considering whether an emergency requiring immediate action to protect the public health and safety exists;

B.      Upon abandonment of the site;

C.      Upon direction of the Executive Director for failure to secure and maintain adequate financial assurance as required; or

D.      Upon permittee's notification to the TCEQ that the facility will no longer operate.

E.      The facility shall be closed in accordance with the requirement of the closure plan as described in Part III of the permit application.

## VI.    Standard Permit Conditions

A.      This permit is based on and the site owner/operator shall follow the permit application submittal dated August 9, 2012, and revised April 10, 2013, June 10, 2013, August 10, 2013, and October 23, 2013. These application submittals are hereby approved subject to the terms of this permit, the rules and regulations, and any orders of the TCEQ. These application materials are incorporated into this permit by reference in Attachment A as if fully set out herein. Any and all revisions to these elements shall become conditions of this permit upon the date of approval by the Commission. The permittee shall maintain the Application and all supporting documentation at the facility and make them available for inspection by TCEQ personnel.

B.      Attachment B, consisting of amendments, modifications, and corrections to this permit, is hereby made a part of this permit.

C.      The permittee shall comply with all conditions of this permit. Failure to comply with any condition may constitute a violation of the permit, the rules of the Commission, and the Texas Solid Waste Disposal Act and is grounds for an enforcement action, revocation, or suspension.

D.      Inspection and entry onto the site by authorized personnel shall be allowed during the site operating life.

E.      The provisions of this permit are severable. If any permit provision or the application of any permit provision to any circumstance is held invalid, the remainder of this permit shall not be affected.

F.      Regardless of the specific designs contained in the permit application, the permittee shall be required to meet all performance standards in the permit, the application, or as required by local, State, and Federal laws.

G.      If differences arise between these permit provisions and the Application, these permit provisions shall prevail.

H.      The permittee shall comply with the requirements of the air permit requirements in 30 TAC §332.8.

VII.   **Incorporated Regulatory Requirements**

    A.   The permittee shall comply with all applicable Federal, State, and local regulations and shall obtain any and all other required permits prior to the beginning of any operation authorized by this permit.

    B.   To the extent applicable to the activities authorized by this permit, the requirements of 30 TAC Chapters 37, 281, 305, 330, and 332, and future revisions are adopted by reference and are hereby made provisions and conditions of this permit.

VIII.   **Special Permit Provisions**

Any subsurface disturbance in the historically significant area designated by the Texas Historical Commission shall be approved by the Texas Historical Commission and the Texas Commission on Environmental Quality prior to subsurface disturbance.

IX.   **ATTACHMENT A**

The Permit Application.

X.   **ATTACHMENT B**

Amendments, Modifications, and Corrections to MSW Permit No. 2382.



# TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

May 5, 2014

TO:   Persons on the attached mailing list.

RE:   Netex Composting, Inc.
      Permit No. 2382

This letter is your notice that the Texas Commission on Environmental Quality (TCEQ) executive director (ED) has issued final approval of the above-named application. According to 30 Texas Administrative Code (TAC) Section 50.135 the approval became effective on May 1, 2014, the date the ED signed the permit or other approval unless otherwise specified in the permit or other approval.

You may file a **motion to overturn** with the chief clerk. A motion to overturn is a request for the commission to review the TCEQ ED's approval of the application. Any motion must explain why the commission should review the TCEQ executive director's action. According to 30 TAC Section 50.139 an action by the ED is not affected by a motion to overturn filed under this section unless expressly ordered by the commission.

A motion to overturn must be received by the chief clerk within 23 days after the date of this letter. An original and 7 copies of a motion must be filed with the chief clerk in person, or by mail to the chief clerk's address on the attached mailing list. On the same day the motion is transmitted to the chief clerk, please provide copies to the applicant, the ED's attorney, and the Public Interest Counsel at the addresses listed on the attached mailing list. If a motion to overturn is not acted on by the commission within 45 days after the date of this letter, then the motion shall be deemed overruled.

You may also request **judicial review** of the ED's approval. According to Texas Water Code Section 5.351 a person affected by the ED's approval must file a petition appealing the ED's approval in Travis County district court within 30 days after the <u>effective date of the approval</u>. Even if you request judicial review, you still must exhaust your administrative remedies, which includes filing a motion to overturn in accordance with the previous paragraphs.

Individual members of the public may seek further information by calling the Public Education Program, toll free, at 1-800-687-4040.

Sincerely,

Bridget C. Bohac
Chief Clerk

BCB/lg

Enclosure

MAILING LIST
for
Netex Composting, Inc.
Permit No. 2382

FOR THE APPLICANT:

Thomas Leslee Rawson, CEO, Owner
Netex Composting, Inc.
P.O. Box 2008
Sulphur Springs, Texas 75483

Kathy Bell, M.S., P.E.
Bell Environment Engineering
1323 County Road 3260
Quitman, Texas 75783

INTERESTED PERSONS:

See attached list.

FOR THE EXECUTIVE DIRECTOR
via electronic mail:

Brian Christian, Director
Texas Commission on Environmental
Quality
Small Business and Environmental
Assistance
Public Education Program MC-108
P.O. Box 13087
Austin, Texas 78711-3087

Daniel Ingersoll, Staff Attorney
Texas Commission on Environmental
Quality
Environmental Law Division MC-173
P.O. Box 13087
Austin, Texas 78711-3087

Mario Perez, Technical Staff
Texas Commission on Environmental
Quality
Waste Permits Division
Municipal Solid Waste Permits Section
MC-124
P.O. Box 13087
Austin, Texas 78711-3087

FOR PUBLIC INTEREST COUNSEL
via electronic mail:

Blas J. Coy, Jr., Attorney
Texas Commission on Environmental
Quality
Public Interest Counsel MC-103
P.O. Box 13087
Austin, Texas 78711-3087

FOR THE CHIEF CLERK
via electronic mail:

Bridget C. Bohac, Chief Clerk
Texas Commission on Environmental
Quality
Office of Chief Clerk MC-105
P.O. Box 13087
Austin, Texas 78711-3087

HIGHFIELD , BETH
638 COUNTY ROAD 3372
PICKTON TX 75471-3316

HIGHFIELD , HEATH
950 COUNTY ROAD 3372
PICKTON TX 75471-3336

HIGHFIELD , REX
638 COUNTY ROAD 3372
PICKTON TX 75471-3316

HIGHFIELD , WILLIAM A
5603 CANCUN DR
NORTH RICHLAND HILLS TX 76180-6553

MCGREGOR , MRS DIANNA
608 COUNTY ROAD 3367
PICKTON TX 75471-3304

# Texas Commission on Environmental Quality



**Permit** for Municipal
Solid Waste (MSW) Management Site
Issued under provisions of Texas
Health & Safety Code
Chapter 361

MSW Permit No.: 2379

Name of Site Operator/Permittee: Liquitek, LLC

Property Owner: LJC Properties, LLC

Facility Name: Liquitek Arlington Liquid Waste Processing Facility

Facility Address: 408 113th Street, Arlington, Texas 76011

Classification of Site: Type V Liquid Waste Processing Facility

The permittee is authorized to store and process wastes and to recycle recovered materials in accordance with the limitations, requirements, and other conditions set forth herein. This permit is granted subject to the rules and Orders of the Commission and laws of the State of Texas. Nothing in this permit exempts the permittee from compliance with other applicable rules and regulations of the Texas Commission on Environmental Quality. This permit will be valid until canceled, amended, or revoked by the Commission.

*Approved, Issued and Effective* in accordance with Title 30 Texas Administrative Code (30 TAC) Chapter 330.

Issued Date: November 9, 2012

For the Commission

**Liquitek, LLC**
**Liquitek Arlington Liquid Waste Processing Facility**
**MSW Permit No. 2379**

### Table of Contents

I.  Size and Location of Facility ................................................................................ 3

II.  Facilities and Operations Authorized ................................................................. 3

III.  Facility Design, Construction, and Operation ................................................... 4

IV.  Financial Assurance ............................................................................................. 5

V.  Facility Closure .................................................................................................... 6

VI.  Standard Permit Conditions ............................................................................... 6

VII.  Incorporated Regulatory Requirements ............................................................ 7

VIII.  Special Permit Provisions .................................................................................. 7

IX.  Attachment A ...................................................................................................... 7

X.  Attachment B ...................................................................................................... 7

I.    **Size and Location of Facility**

A.    This Type V facility is located at 408 113th Street, in Arlington, Tarrant County, Texas. The facility contains 2.37 acres.

B.    The legal description is contained in Appendix 1 of the application.

C.    Coordinates and Elevation of Site Permanent Benchmark:

Latitude:      32° 44' 46.080" N
Longitude:    97° 02' 34.080" W
Elevation: 568 feet above Mean Sea Level

II.   **Facilities and Operations Authorized**

A.    Days and Hours of Operation

The operating and waste acceptance hours of this municipal solid waste facility will be 24 hours per day, 7 days a week. The operator shall post the actual operating and waste acceptance hours on the site sign.

B.    Wastes Authorized at this Facility

The permittee is authorized to store and process food wastes, Class 2 non-hazardous industrial liquid waste containing fats and non-petroleum oils from food processing facilities, and grease trap waste from restaurants and food preparation/service facilities.

C.    Wastes Prohibited at This Facility

Any waste not listed in the above paragraph, prohibited waste, and unauthorized waste shall not be allowed.

D.    Waste Acceptance Rate

Liquid waste, as described in Section II.B, may be accepted for processing at this facility at a rate of up to 66,000 gallons per day in Phase I and up to 130,000 gallons-per-day in Phase II.

E.    Maximum Volume Available for Storage

Total available liquid waste storage capacity of this facility is 40,000 gallons in Phase I and 80,000 gallons in Phase II with a maximum storage limit of 72 hours for untreated waste materials and 120 hours for processed waste materials.

F.    Facilities Authorized

The facility will be constructed in two phases:

In Phase I, the facility will consist of two dewatering units, two liquid waste storage tanks, and ancillary equipment.

In Phase II, the facility will add two dewatering units and two liquid waste storage tanks to the site. The facility may choose to add a heated grease recovery system in place of one of the storage tanks as part of Phase II.

G.    Changes, Additions, or Expansions

Any proposed facility changes must be authorized in accordance with TCEQ rules in 30 Title Administrative Code Chapter (TAC) 330 (Municipal Solid Waste) and 30 TAC Chapter 305 (Consolidated Permits).

## III.    Facility Design, Construction, and Operation

A.    Facility design, construction, and operation must comply with this permit, Commission Rules, including 30 TAC Section (§§)330.61, 330.201-330.249, §330.127 and Special Provisions contained in this permit, and the permit application.

B.    The entire waste management facility shall be designed, constructed, operated, and maintained to prevent the release and migration of any waste, contaminant, or pollutant, and to prevent inundation or discharge from the areas surrounding the facility components. This site must be designed, constructed and maintained to collect spills and incidental precipitation in such a manner as to:

1.    preclude the release of any contaminated runoff or spills; and

2.    prevent washout of any waste by a 100-year storm.

C.    The site shall be designed and operated so as not to cause a violation of:

1.    the requirements of the Texas Water Code, §26.121;

2.    any requirements of the Federal Clean Water Act, including, but not limited to, the National Pollutant Discharge Elimination System (NPDES) requirements, §402 as amended; and/or the Texas Pollutant Discharge Elimination System (TPDES), as amended;

3.    the requirements under the Federal Clean Water Act, §404, as amended; and

4.  any requirement of an area wide or statewide water quality management plan that has been approved under the Federal Clean Water Act, §208 or §319, as amended.

D.  All facility employees and other persons involved in facility operations shall be qualified, trained, and experienced to perform their duties so as to achieve compliance with this permit. The permittee shall further ensure that personnel are familiar with safety procedures, contingency plans, the requirements of the Commission's rules, and this permit, commensurate with their levels and positions of authority.

## IV.  Financial Assurance

A.  General. Authorization to operate the facility is contingent upon compliance with provisions contained in this permit and maintenance of financial assurance in accordance with 30 TAC Chapter 330 Subchapter L §330.505(b) and 30 TAC Chapter 37.

B.  Closure Financial Assurance. The amount of financial assurance posted for closure shall be provided annually in current dollars in an amount for closing the entire facility pursuant to 30 TAC §37.131. The owner and/or operator shall annually adjust the closure cost estimate and the dollar amount of the financial assurance for inflation within 60 days prior to the anniversary date of the permit pursuant to 30 TAC §37.131.

C.  Closure Financial Assurance Amount. Within 60 days after the date of permit issuance or prior to the initial receipt of waste, the permittee shall provide financial assurance instrument(s) for demonstration of closure in an amount not less than $23,276.00 for closure of Phase I in 2012 dollars and $35,754.00 for closure of Phase II in 2012 dollars. The Phase II closure cost is the cost of closing the entire facility and shall supersede the Phase I closure cost when installation of Phase II units is completed and prior to the receipt of waste in Phase II units. The amount of financial assurance to be posted annually shall be determined as described in Section IV.B. of this permit. When operations using Phase II units commences, the amount of financial assurance must be adjusted to meet the Phase II closure costs of $35,754 in 2012 dollars.

D.  Closure Plan Modifications. If the facility's closure plan is modified, the permittee shall provide new cost estimates in current dollars, which meet the requirements 30 TAC Chapter 37 and 30 TAC Chapter 330, Subchapter L. Modifications shall be made pursuant to 30 TAC §305.70. The amount of the financial assurance mechanism shall be adjusted within 20 days after the modification is approved. Adjustments to the cost estimates and/or financial assurance instrument to comply with any financial assurance regulation that is adopted by the TCEQ subsequent to the issuance of this permit shall be initiated as a modification within 30 days after the effective date of the new regulation.

**V.    Facility Closure**

Closure shall commence:

A.    Upon direction by the Executive Director of the TCEQ for failure to comply with the terms and conditions of this permit or violation of state or federal regulations.

The Executive Director is authorized to issue emergency orders to the permittee in accordance with §§5.501 and 5.512 of the Texas Water Code regarding this matter after considering whether an emergency requiring immediate action to protect the public health and safety exists;

B.    Upon abandonment of the site;

C.    Upon direction of the Executive Director for failure to secure and maintain adequate financial assurance as required; or

D.    Upon permittee's notification to the TCEQ that the facility will no longer operate.

**VI.    Standard Permit Conditions**

A.    This permit is based on and the site owner/operator shall follow the permit application submittals dated January 25, 2012 and revised February 9, 2012, May 24, 2012 and July 19, 2012. These application submittals are hereby approved subject to the terms of this permit, the rules and regulations, and any orders of the TCEQ. These application materials are incorporated into this permit by reference in Attachment A as if fully set out herein. Any and all revisions to these elements shall become conditions of this permit upon the date of approval by the Commission. The permittee shall maintain the application and all supporting documentation at the facility and make them available for inspection by TCEQ personnel.

B.    Attachment B, consisting of amendments, modifications, and corrections to this permit, is hereby made a part of this permit.

C.    The permittee shall comply with all conditions of this permit. Failure to comply with any condition may constitute a violation of the permit, the rules of the Commission, and the Texas Solid Waste Disposal Act and is grounds for an enforcement action, revocation, or suspension.

D.    Inspection and entry onto the site by authorized personnel shall be allowed during the site operating life.

E.    The provisions of this permit are severable. If any permit provision or the application of any permit provision to any circumstance is held invalid, the remainder of this permit shall not be affected.

F.     Regardless of the specific designs contained in the permit application, the permittee shall be required to meet all performance standards in the permit, the application, or as required by local, state, and federal laws.

G.     If differences arise between the rules, regulations, and permit provisions and the incorporated application materials, then the rules, regulations, and permit provisions shall prevail.

H.     The permittee shall comply with the requirements of the air permit exemption in 30 TAC §106.534, if applicable, and the applicable requirements of 30 TAC chapters 106, 116 and Subchapter U of 30 TAC Chapter 330.

## VII.   Incorporated Regulatory Requirements

A.     The permittee shall comply with all applicable federal, state, and local regulations and shall obtain any and all other required permits prior to the beginning of any operation authorized by this permit.

B.     To the extent applicable to the activities authorized by this permit, the requirements of 30 TAC Chapters 37, 281, 305, and 330, and future revisions are adopted by reference and are hereby made provisions and conditions of this permit.

## VIII.   Special Permit Provision

The facility will be developed in two phases as described in the permit application. At such a time that the facility commences operation of Phase II units, the owner/operator should submit notification to the Executive Director that Phase II units are operational.

## IX.   Attachment A

The Permit Application.

## X.   Attachment B

Amendments, Modifications, and Corrections to MSW Permit No. 2379.

Bryan W. Shaw, Ph.D., *Chairman*
Carlos Rubinstein, *Commissioner*
Toby Baker, *Commissioner*
Zak Covar, *Executive Director*



## TEXAS COMMISSION ON ENVIRONMENTAL QUALITY

*Protecting Texas by Reducing and Preventing Pollution*

November 13, 2012

Dave Martin
Liquitek, LLC
P.O. Box 470383
Fort Worth, Texas 76147-0383

RE: Liquitek, LLC – Tarrant County
Permit No. 2379

This letter is your notice that the Texas Commission on Environmental Quality (TCEQ) executive director (ED) has issued final approval of the above-named application. According to 30 Texas Administrative Code (TAC) Section 50.135 the approval became effective on the date the ED signed the permit or other approval. A copy of the final approval is enclosed and cites the effective date.

You may file a **motion to overturn** with the chief clerk. A motion to overturn is a request for the commission to review the TCEQ executive director's approval of the application. Any motion must explain why the commission should review the TCEQ executive director's action. According to 30 TAC Section 50.139 an action by the ED is not affected by a motion to overturn filed under this section unless expressly ordered by the commission.

A motion to overturn must be received by the chief clerk within 23 days after the date of this letter. An original and 7 copies of a motion must be filed with the chief clerk in person or by mail. The Chief Clerk's mailing address is Office of the Chief Clerk (MC 105), TCEQ, P.O. Box 13087, Austin, Texas 78711-3087. On the same day the motion is transmitted to the chief clerk, please provide copies to Robert Martinez, Environmental Law Division Director (MC 173), and Blas Coy, Public Interest Counsel (MC 103), both at the same TCEQ address listed above. If a motion is not acted on by the commission within 45 days after the date of this letter, then the motion shall be deemed overruled.

You may also request **judicial review** of the ED's approval. According to Texas Water Code Section 5.351 a person affected by the ED's approval must file a petition appealing the ED's approval in Travis County district court within 30 days after the <u>effective date of the approval</u>. Even if you request judicial review, you still must exhaust your administrative remedies, which includes filing a motion to overturn in accordance with the previous paragraphs.

Individual members of the public may seek further information by calling the TCEQ Public Education Program, toll free, at 1-800-687-4040.

Sincerely,

*Bridget C. Bohac*

Bridget C. Bohac
Chief Clerk

BCB/lg

cc: Blas Coy, TCEQ Public Interest Counsel (MC 103)

P.O. Box 13087 • Austin, Texas 78711-3087 • 512-239-1000 • tceq.texas.gov
How is our customer service? tceq.texas.gov/customersurvey
printed on recycled paper